Joseph James **BLAKE**, Petitioner,

v.

Walter **ZANT**, Warden, Georgia Diagnostic and Classification Center, Respondent.

Christopher A. **BURGER**, Petitioner,

v.

Walter B. **ZANT**, Warden, Georgia Diagnostic and Classification Center, Respondent.

William Neal **MOORE**, Petitioner,

v.

Charles **BALKCOM**, Warden, Respondent.

Nos. CV480–251, CV280–114 and CV478–309.

United States District Court, S. D. Georgia, Savannah and Brunswick Divisions.

April 29, 1981.

Millard Farmer, Joseph M. Nursey, Andrea I. Young, Atlanta, Ga., for petitioners Blake & Burger.

H. Diana Hicks, Nashville, Tenn., for petitioner Moore.

Susan V. Boleyn, Charles E. Brown, William B. Hill, Jr., Atlanta, Ga., for respondents.

## ORDER

B. AVANT EDENFIELD, District Judge.

The Court this date enters the attached Orders in these habeas corpus capital punishment actions. Each case is unique, and, accordingly, each Order has been developed and is intended to be construed individually. Moreover, many broad questions which these cases might suggest have been reserved for possible future consideration in other contexts. Nonetheless, I am fully cognizant of the unique public concern which attaches to cases such as these. The Court also recognizes their broader significance in the development of law in this field and particularly with respect to United States Supreme Court decisions like *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), which in fact extensively discusses the Georgia Supreme Court's analysis in *Blake v. State*, 239 Ga. 292, 236 S.E.2d 637 (1977). Furthermore, the Court concludes that, precisely because these cases do present varied legal and factual questions, they offer a valuable opportunity for general comment on the development of the law of capital punishment. The Court also believes that its own experience in considering these cases may provide some useful insight into the practical possibilities and limitations of judicial review in this unique field.

Accordingly, the Court attaches, as an appendix to these Orders, certain broad comments on the problems and, in this Court's view, likely outcome of this on-going process of judicial and legislative development. Of course, these comments are, and must be, general and to some extent tentative, though they are certainly not unconsidered. Thus, I in no way intimate any settled view as to issues which may be presented to the Court in some future proceeding. Nor do these reflections constitute any part of the bases for the Court's holdings with respect to the individual habeas petitions.

### CV480–251

Before the Court is a petition for writ of habeas corpus for review of the judgment of the Superior Court of Chatham County, Georgia, and the conviction and sentence of death imposed upon the petitioner. Numerous arguments have been raised by petitioner, but the Court will review only two in detail here: petitioner's allegations of ineffective assistance of counsel, (1) in both the guilt and sentencing phases of trial because of a lack of expert psychiatric opinion in the development and presentation of his defense of insanity, and (2) at the sentencing phase of trial because of counsel's failure to consider or develop possible mitigating circumstances. For reasons discussed below, the Court finds that both of these arguments must be sustained. Therefore, petitioner's conviction and sentence of death will be vacated, and the case remanded for new trial on all issues, or release, within 120 days.

### Background

Petitioner Joseph James Blake was tried in the Chatham County Superior Court for the murder of Tiffany Lowery, a two-year old child and the daughter of Jacquelyn Lowery whom Mr. Blake had been seeing for some time. The child was killed November 15, 1975. Petitioner was brought to trial and convicted February 14, 1976. The death penalty was imposed February 18, 1976. Conviction and sentence were both

upheld by the Georgia Supreme Court in *Blake v. State*, 239 Ga. 292, 236 S.E.2d 637 (1977). Petitioner then filed for certiorari to the Supreme Court of the United States. This motion was denied November 14, 1977. *Blake v. Georgia*, 434 U.S. 960, 98 S.Ct. 492, 54 L.Ed.2d 320 (1977).

On March 7, 1978, petition for writ of habeas corpus was filed in the Superior Court of Tattnall County. A hearing was held on May 24, 1978, with the petition denied by an Order of August 17, 1978. Petitioner's application for certificate of probable cause to appeal was denied by the Supreme Court of Georgia on January 11, 1979.

Petitioner also filed a motion for extraordinary relief which was heard in the Superior Court of Chatham County on May 13, 1979. Subsequently, this motion was denied and denial affirmed by the Georgia Supreme Court on October 16, 1979. *Blake v. State*, 244 Ga. 466, 260 S.E.2d 876 (1979). Petitioner then filed for writ of certiorari in the United States Supreme Court seeking review of the denial of this extraordinary motion. This petition was denied June 2, 1980, with rehearing also denied on August 11, 1980.

Thereafter, a second state habeas corpus petition was filed in the Superior Court of Butts County. This action was dismissed as successive on September 2, 1980.[1] The Georgia Supreme Court denied application for certificate of probable cause September 4, 1980. On September 5, 1980, this Court granted a stay of execution, to permit consideration of the present petition for habeas corpus relief, which was also filed September 5, 1980.[2] A hearing was conducted on December 12, 1980. The respondent presented no evidence at this hearing. However, testimony was received from certain witnesses for petitioner, notably Mr. Reginald Haupt, Jr., who represented the petitioner at trial and subsequently in all other steps through denial of extraordinary relief by the Georgia Supreme Court. The Court also entertained argument at this hearing, and by prior written memoranda.

### Facts

The circumstances leading up to the death of Tiffany Lowery are generally not in dispute. In November, 1975, Jacquelyn Lowery and the decedent child were living with her mother, Mrs. Florence Smith, and several of Mrs. Smith's other children. Jacquelyn and Mr. Blake had dated for about nine months and planned to be married. The petitioner asked Jacquelyn to go out with him the evening of November 14, 1975, but she told him that she planned to go out with a girlfriend, Denise Walker, instead. Nonetheless, Mr. Blake persisted and, finally, after meeting her at the Walker home, Jacquelyn agreed to let the petitioner take her out drinking.

Jacquelyn's mother kept Tiffany while Jacquelyn, Ms. Walker, the petitioner and several other persons went first to one bar and then another. During the course of the evening, a dispute developed between Mr. Blake and Jacquelyn, perhaps because of her interest in another man. Petitioner struck Ms. Lowery on the side of the head with his fist. He was ejected from the lounge at that time and again around midnight when he tried to return.

Mrs. Smith testified that Tiffany and the other children had gone to bed shortly after 9:30 p. m. Mrs. Smith left the house to visit friends around 10:15 p. m. and returned about two hours later. She then noticed that the window next to the front door had been opened, and the curtains pulled back. However, Mrs. Smith did not believe anything was seriously amiss at that time. At approximately 1:00 a. m., Mr. Blake called Mrs. Smith. He asked whether Jacquelyn was home. When told that she was not, Mr. Blake informed Mrs. Smith that he had taken Tiffany. Mrs. Smith

---

**1.** Under Georgia law, any further efforts to obtain habeas corpus relief would surely be dismissed as well. Ga.Code Ann. § 50–127(10). Thus, it appears that state remedies have been exhausted.

**2.** Petitioner filed a similar action in this Court on March 28, 1979. On January 24, 1979, the Court allowed voluntary dismissal of this suit.

began scolding him for having the child out so late on a cold evening. Mr. Blake then hung up without saying anything more. However, it does not appear that Mr. Blake's having the child was in itself a source of major concern. He had taken the child out alone several times in the past, and his relations with her as well as the rest of the family had been good.

Petitioner testified that, after he had been thrown out of the bar the second time, he had gone back to Jacquelyn's home. When no one answered, he opened the window, unlocked the door, and entered. He found everyone except Tiffany asleep. Mr. Blake testified that he asked Tiffany if she wanted to go with him. She agreed and they left by the back door. Mr. Blake indicated that his intention was to take the child away because her mother did not deserve the child and had mistreated her in a variety of respects.

Mr. Blake testified further that he first intended to run away with Tiffany and, accordingly, crossed the Talmadge Memorial Bridge as the quickest exit route. Mr. Blake stated that he drove as far as Buford, South Carolina. However, he realized at some point that he could not simply run away with the child without being chased by the authorities. Initially, he reacted to this fact by deciding to kill himself and Tiffany there in Buford. Petitioner later decided to return to Savannah. He testified that he stopped on the bridge. There he and Tiffany prayed about going to "another world" and being together forever "on the other side." Petitioner then dropped the child off the bridge to her death, which occurred on impact or very shortly thereafter.

Mr. Blake explained that he postponed his own trip to "the other side" so that he could tell the child's mother what had happened and why. Thus, petitioner did not in fact make any effort to conceal his actions. Quite the opposite, he contacted the police almost immediately after the incident, and began giving them substantially the same account of Tiffany's death that he testified to at trial, emphasizing that "I know I did wrong, but in another way I did right," T. 139, while never once indicating that he thought that the child had been harmed or killed. T. 147.

### Arguments Presented

Petitioner here has raised numerous arguments as grounds for relief with respect to the guilt-innocence phase of the trial, as well as the sentencing proceeding. Several of these arguments relate to ineffective assistance of counsel. In particular, petitioner asserts constitutional error in that his attorney (1) failed to have closing arguments transcribed; (2) failed to prepare properly for the sentencing phase of trial; and, (3) did not and could not obtain expert psychiatric assistance in the development and presentation of the defense of insanity. Petitioner alleges constitutional error in several other respects as well: (1) that the jury's discretion in passing sentence was not sufficiently guided by the trial court's instruction and statutory language, particularly that relating to "depravity of mind" as an aggravating circumstance; (2) that petitioner was prejudiced at both stages of the trial by introduction of evidence of a prior misdemeanor conviction which was not relevant to his guilt or permissible as an aggravating circumstance; and (3) that the jury did not believe that their finding would lead to petitioner's execution. More generally, petitioner argues (1) that administration of the death penalty in the manner prescribed in Georgia is unconstitutionally cruel and particularly so here in view of petitioner's present mental disability; (2) that the death penalty is inflicted arbitrarily under Georgia law; (3) that infliction of the death penalty is based on impermissible factors such as race, sex, and poverty; (4) that no theoretical justification for the death penalty exists; and, (5) that persons having scruples against capital punishment were improperly excluded from the trial jury. Because the Court finds petitioner's second and third arguments with respect to ineffective assistance of counsel determinative, only these issues will be considered below.

*Analysis*

(1)

The Court will consider first whether Mr. Blake was afforded constitutionally adequate representation in the sentencing portion of his trial. The circumstances surrounding this proceeding were testified to in some detail at the December hearing in this case. Mr. Haupt indicated that he represented the petitioner as a court-appointed attorney. Mr. Haupt is an experienced trial lawyer having defended in as many as a hundred or more capital cases. However, Mr. Haupt testified that, as was then his custom, he did not prepare in any way to present mitigating factors in the event petitioner was convicted. Counsel explained that he had not proceeded to trial expecting or planning for the conviction which did come. Of course, in other cases where no bifurcated procedure was involved, Mr. Haupt's policy would have created no problem. And, according to Mr. Haupt, under present policies of the Chatham County Superior Court, this approach would also have been adequate, because a continuance is generally permitted to allow preparation for the sentencing phase of trial. However, when Mr. Blake was tried, the custom was to proceed directly to the question of sentence. Thus, Mr. Haupt testified that, when the jury went out after closing arguments, he could "feel" that a verdict of guilty was likely. During the jury's deliberations, he approached the trial judge and asked for a continuance to prepare for the sentencing phase. In line with prevailing policy, he was told that no continuance would be granted.

Thus, even though no formal motion appears on the record, Mr. Haupt's uncontradicted testimony is that he was forced by his own strategy and court policies to proceed to sentencing with no prior preparation or consideration whatsoever. No witnesses had been interviewed and no thought given to how counsel might show the jury "something good" about Mr. Blake. Mr. Haupt merely presented oral argument presumably not much different from that which had already failed in the prior phase

of trial. No evidence in mitigation was presented, though the trial court did indicate that a psychiatrist's report which was already in evidence could be considered by the jury.

The broad legal standard for evaluating performance of counsel in this or other contexts is easily articulated. A defendant is entitled to an attorney likely to render and, in fact, rendering reasonably effective assistance, whether that attorney be retained or court-appointed. *Kemp v. Leggett,* 635 F.2d 453 (5th Cir. 1981). This standard is, of course, to be applied with particular care in capital cases. See *Voyles v. Watkins,* 489 F.Supp. 901, 910 (N.D.Miss. 1980); *Smotherman v. Beto,* 276 F.Supp. 579, 586 (N.D.Tex.1967). As the United States Supreme Court has noted, death is a unique penalty "both in its severity and its finality.... It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 357–58, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) (Stevens, Stewart, Powell, JJ.). Furthermore, the importance of the attorney's role does not diminish at the sentencing stage. Quite the opposite, "sentencing is a critical stage of criminal proceeding at which [the defendant] is entitled to effective assistance of counsel." *Id.* at 358, 97 S.Ct. at 1204. Effective assistance at this stage requires "zealous, and not merely perfunctory or pro forma representation." *Voyles, supra,* at 912.

In the present case, this Court is confronted with conduct that falls far short of the requirement that reasonably adequate assistance in fact be rendered. Mr. Haupt's uncontradicted testimony establishes that, through a combination of his own lack of foresight and trial policies which have since been abandoned, substantially no effort was made to prepare any defense for the petitioner in the sentencing phase of trial. To be sure, there is no reason to conclude that Mr. Haupt did not attempt or, in fact, accomplish a reasonably cogent argument before the jury. *Cf. Voyles, supra,*

at 912. However, it is apparent that this argument could do little more than repeat what had already proven ineffective once before. Mr. Haupt in no way used or even considered additional evidence which might have been available to support the defendant's cause. Such a performance hardly comports with the notion that the sentencing phase be in fact a distinct procedure where the jury's attention is focused not just on the circumstances of the crime, but also on "special facts about this defendant that mitigate against imposing capital punishment (e. g., his youth, the extent of his cooperation with the police, his emotional state at the time of the crime)." *Gregg v. Georgia,* 428 U.S. 153, 197, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1975) (Stewart, Stevens, Blackmun, Powell, JJ). Counsel's failure to make distinct preparation here is particularly significant in light of the fact that "much of the information that is relevant to the sentencing decision may have no relevance to the question of guilty, or may even be extremely prejudicial to a fair determination of that question." *Id.,* at 190, 96 S.Ct., at 2933.

There is authority for the proposition that ineffective assistance of counsel need not be grounds for new trial without some additional showing that prejudice resulted. In *Davis v. Alabama,* 596 F.2d 1214 (5th Cir. 1979), vacated as moot 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980),[3] the court required a demonstration of harm arising through counsel's failure to develop a possible insanity defense. However, *Davis* also makes clear that a showing of prejudice is not always required. "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice resulting from its denial." *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). The Supreme Court has apparently never applied the harmless error doctrine to a case involving ineffective assistance of counsel, and, in fact, several recent cases do not even inquire into prejudice. See *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), *rev'g. United States v. Fink,* 502 F.2d 1 (5th Cir. 1974); *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). See also *Davis, supra,* at 1221–22. Furthermore, the Court has held that, when a defense attorney puts on what amounts to no defense at all, it would "not stop to determine whether prejudice resulted." *Hamilton v. Alabama,* 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961).

The present case closely approaches a situation where effectively no defense at all was presented at the sentencing phase. To be sure, there was some effect from the prior cross-examination of the state's psychiatrist, Dr. Bosch, though this was in itself seriously inadequate for reasons to be discussed shortly. Similarly, Mr. Haupt's argument may have had some persuasive value. But, the uncontraverted evidence now before this Court establishes that Mr. Haupt simply made no independent effort to develop facts which might have established "something good" about Mr. Blake.

Nonetheless, petitioner has made a credible if hardly overwhelming showing of prejudice. Several witnesses presented at the December hearing indicated that they knew the petitioner and would have testified in his behalf. These or other witnesses might conceivably have demonstrated to the jury that the petitioner was not the totally reprehensible person they apparently determined him to be. Certainly, they would have provided some counterweight to evidence of bad character which was in fact received. In any event, this Court is unwilling to engage in "nice distinctions" concerning what witnesses might have been available and precisely what testimony might have been given to what effect.

**3.** Of course, the Supreme Court's action technically removes any precedential valve from *Davis. See, e. g., United States v. Sarmiento-Rozo,* 592 F.2d 1318, 1321 (5th Cir. 1979). However, the case remains useful "as the most pertinent statement of the governing law even if it is not directly binding." *County of Los Angeles v. Davis,* 440 U.S. 625, 646, 99 S.Ct. 1379, 1391, 59 L.Ed.2d 642 (1979) (Powell, J. dissenting).

Now, five years after petitioner's trial, such fine calculations simply do not seem realistic. Petitioner has demonstrated that no favorable evidence was sought and that some was in fact available. This showing seems to the Court sufficient to support a new trial on the issue of sentence. Counsel's conduct was clearly not "harmless beyond a reasonable doubt." *Davis, supra,* at 1221, *quoting Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

### (2)

Petitioner's allegation that effective assistance of counsel was denied by his attorney's inability to obtain expert psychiatric advice and testimony is a source of particular concern to the Court. There is no question that the sanity of the petitioner was seriously in issue in this case. The very circumstances of the crime may be seen as creating real doubt as to Mr. Blake's mental competence. Thus, on *voir dire,* the prosecution consistently asked potential jurors "Do you have any idea, any preconceived idea, that a person that would do something like this has got to be insane?" V.D., at 14. And, in fact, one potential juror was excluded because he was of the opinion that "anybody who would drop a baby off the Talmadge Bridge has got to be mentally deranged." V.D., at 6. Furthermore, in his opening statement, the prosecutor specifically indicated that "the State's case and a lot of the evidence you will hear will be directed toward the idea of motive and giving you an explanation of why this happened." T., at 4. Counsel indicated that the state intended to show "a basis, a rational basis, behind his (Mr. Blake's) actions," T., at 7; and, Mr. Haupt joined the issue, claiming that "you will not find any rationalization; you will not find any rational basis or (sic) anything that occurred in the incident which you are about to try." T., at 8.

In this case, virtually the sole substantial issue at trial was the sanity of the defendant when the homicide occurred. This was well-recognized by both sides. It was also well-appreciated by the trial court which in fact ordered a psychiatric examination of Mr. Blake. This examination was performed under then-prevailing policies for indigent defendants in Chatham County. Mr. Blake was taken to Central State Hospital in Milledgeville, Georgia, for examination in the state-operated facility for the criminally insane.[4] The stated purposes of this examination were to determine: (1) the defendant's psychiatric condition at the time of the crime; (2) whether the defendant was competent to stand trial; (3) recommendations which might be appropriate, presumably for the defendant's treatment; and, (4) any mitigating circumstances which might be present. T., at 109. The exact nature and extent of the examination which was performed is not easily determined from the present record. However, it appears that it included a personal interview with Dr. Miguel A. Bosch, director of the Forensic Psychiatric Center (the maximum security hospital) who then prepared a report which was the basis of his testimony at trial.

Relying upon his interview with the defendant, and perhaps other information, Dr. Bosch testified that

based upon on my examination and evaluation, what I saw it, to me this man is not suffering from a psychotic condition. He's not suffering from what is called a schizophrenia reaction, paranoid type. He is not suffering from what is called a manic psychosis. He doesn't have that kind of illness. He does have problem; he does have—again; he was upset, he was having financial difficulty....

T. 118. Dr. Bosch thus concluded that the defendant was not insane at the time of the interview. However, Dr. Bosch also found that Mr. Blake was then suffering from a "reactive-depressive condition" which the doctor attributed to his obviously difficult position. Dr. Bosch described this condition

---

**4.** According to Mr. Haupt's testimony at the evidentiary hearing, this policy has been changed within the last two years to permit appointment of a psychiatrist at public expense.

as involving feelings of guilt, depression, and tension as well as loss of memory and concentration, bad dreams, and other manifestations of distress. T. 91.

In sum, Dr. Bosch found that Mr. Blake did have significant psychiatric problems, but that Mr. Blake was not at the time of the examination mentally incompetent. However, Dr. Bosch's testimony on petitioner's mental condition at the time of the incident and before is in striking contrast. On cross-examination, Dr. Bosch acknowledged that neither he nor, so far as he knew, any physician had examined Mr. Blake prior to the incident. He also indicated that some or all of Mr. Blake's symptoms might have been present before Tiffany was killed. T. 98. Dr. Bosch acknowledged that Mr. Blake had told him of having vivid hallucinations at least since being admitted to the hospital. Most important by far, Dr. Bosch acknowledged the accuracy of his own report when it concluded that "[a]s for his [Mr. Blake's] mental condition at the time of the alleged offense, we would like to state that no opinion could be reached regards to his condition at that time." T. 109.

Dr. Bosch explained the absence of findings on this critical issue by stating that he "couldn't get any information from him. He claimed he had no memory of doing anything wrong. He said he lacked memory about the particular incident." T. 124. As I have already indicated, it is not clear from the record whether Dr. Bosch interviewed petitioner on more than one occasion, though it appears that his report and his testimony dealt with only a single contact with Mr. Blake. T. 90–91, 93.[5] However, even had the petitioner been unable to recall the incident when he spoke with Dr. Bosch, prosecutors had available the transcription of a taped confession which Mr. Blake gave at approximately 10:45 a. m., November 15, or only about eight hours after the homicide. T. 102. This statement described in some detail Mr. Blake's impression of what he had done and why. Moreover, it was completed long before the petitioner had seen an attorney or anyone else who might have been able to "coach" him on the elements of the legal defense of insanity. Inexplicably, neither the tape nor the transcription were provided to Dr. Bosch. Instead, he was given only the police report of the incident, a document which apparently did not provide any direct insight into the petitioner's mental state at the time of the incident. T. 98.

Dr. Bosch's only analysis of the defendant's mental condition at the time of the crime—the only expert analysis which has ever been conducted on this central issue—took place at trial, on the witness stand when Mr. Haupt showed him the transcription. Preliminarily, Dr. Bosch indicated that, if the defendant had known what he was doing when he threw Tiffany off the bridge and if the defendant believed that the conduct was "right," in these circumstances, Mr. Blake would be considered insane. T. 101. After reading the transcript, Dr. Bosch readily acknowledged that Mr. Blake appeared to be "upset." Dr. Bosch further stated that according to Mr. Blake's statement, he was indeed doing "something right . . . something that he have to do it (sic)." T. 103. Finally, addressing the question of Mr. Blake's sanity, the following occurred:

Dr. Bosch: There is, as far as I'm concerned there is to me after reading this, I just can't tell you that was insane or was sane. Nobody can tell you from reading this dissertation that this particular man

5. Mr. Blake testified that he had indeed been unable to discuss the incident with Dr. Bosch at the time of their first meeting. However, petitioner stated that he had later been taken back to Dr. Bosch at his own request and discussed the incident at length. While the Court draws no conclusion concerning whether any such interview occurred, it is interesting to compare Dr. Bosch's statement here that petitioner "had no memory of doing anything wrong" with Mr. Blake's transcribed statement to police that "[w]herever Jacquelyn comes, I want to talk to her to believe I'm telling the truth cause seems like nobody wants to believe me. When I don't do anything I'm guilty for." T. 140. Thus, it appears that Dr. Bosch did somehow acquire at least limited knowledge of petitioner's view of the incident. Of course, this does not alter the fact that Dr. Bosch could provide no opinion of petitioner's sanity at the time of the incident.

got to be sane or got to be insane. Just after reading this ...

Mr. Haupt: Would you suspect insanity?

Mr. Ryan (the prosecutor): Your Honor, if it pleases the court, that's sort of probing in the dark, isn't it?

Dr. Bosch: Like I said, I suspect that this is a man who is upset and who may have an emotional problem or who may have some real problem. But, when you're talking about insanity, that's different from an emotional problem or being upset.

T. 104.

Examination of Dr. Bosch continued for some time. This examination revealed several other points of particular interest. Dr. Bosch admitted that, even though he had previously testified that the defendant had begun hallucinating only after being admitted to the hospital, his own psychiatric report indicated that Mr. Blake had stated that the problem had existed since petitioner sustained a head injury about six years before. Dr. Bosch indicated that such a condition, if established, might well signify brain damage. Furthermore, Dr. Bosch stated that hallucinations often compelled their victims to act. Mr. Haupt also showed Dr. Bosch a note sent by Mr. Blake to the investigating police detective in the case prior to an attempted suicide at the jail, which failed apparently only because the rope Mr. Blake had fashioned broke. This note substantially repeated petitioner's story that Tiffany was waiting for him on "the other side," while declaring that the time had come for him to join her. T. 114. Again, this was apparently Dr. Bosch's first and only examination of the note. But, he did affirm that a bona fide suicide attempt would indicate that Mr. Blake believe his hallucinations. T. 117. Dr. Bosch acknowledged that such a belief would be symptomatic of genuine insanity, rather than mere emotional upset. T. 118.

Dr. Bosch's testimony also occasioned this colloquy concerning how and why his opinions had been so late in coming and based on such limited information, even relative to that which was in the hands of the prosecution:

Mr. Ryan: Your question was that he was not asked to do that (determine sanity at the time of the incident). His answer was he was asked to do it, but he could not test that.

Mr. Haupt: Well, he had no material.

Mr. Ryan: Well, that may be true.

Mr. Haupt: I have the court order to ask for that question.

The Court: You didn't send him any material, did you?

Mr. Haupt: Well, Judge, I didn't even have it (the transcription). I didn't know this was here until yesterday.

The Court: All right, well, he's seen that now.

Mr. Haupt: That's why I wanted him to look at it and to read it.

Mr. Ryan: You still can't use an opinion.

The Court: Well, he can't say one way or the other about his opinion. He says he was upset.

T. 110. Dr. Bosch's testimony concluded without change in the basic points already outlined: (1) Petitioner did not appear to be insane in the doctor's view when examined; (2) Petitioner had not discussed the incident so as to permit formulation of an opinion regarding his prior sanity; and (3) brief perusal of materials first supplied at trial did not permit any firm conclusion; but, (4) these statements, if sincere, were sufficient to establish that the petitioner was in fact insane at the time of the incident. No other expert testimony was received on the question of petitioner's mental condition though there was an indication from the officer who first met Mr. Blake after the incident that petitioner appeared to be "reasonably sane." T. 82.

Several other points were developed through Mr. Haupt's testimony at this Court's evidentiary hearing. Mr. Haupt indicated that at the time of petitioner's trial, a court-appointed attorney was not permitted funds for appointment of a private psychiatrist to examine his client. Mr. Haupt testified that he personally sought such authority from the trial judge in private conversation, but was told that only a state-

employed psychiatrist would be provided and, further, that formal motion for private examination would be both unwelcome and unavailing. Mr. Haupt also testified that the financial circumstances of Mr. Blake's family were too limited for him to ask for their assistance and that his personal experience with local physicians had convinced him that no useful testimony or examination could be obtained without payment. Thus, he made no effort to obtain the assistance of a private psychiatric expert.

With respect to Dr. Bosch, Mr. Haupt made several criticisms. Mr. Haupt stated and the trial record confirms that Dr. Bosch received his initial medical training in Cuba, though it also appears that he had completed substantial training in the United States and been properly certified to practice psychiatry in this country. T. 87. Mr. Haupt also alleged that Dr. Bosch had serious difficulty in comprehending questions on the witness stand, which had hampered cross-examination and perhaps the examination of Mr. Blake as well. Counsel further stated that he considered Dr. Bosch biased for the prosecution because of his position as an employee of the state and a consultant to the Department of Offender Rehabilitation. Mr. Haupt stated that he believed a private physician at least would have provided "a little bit more in depth psychiatric examination" which would have been useful to the defense at both stages of trial.

The circumstances surrounding Dr. Bosch and his testimony present the Court with numerous issues. Certain of petitioner's allegations seem clearly unsupported by the record. Quotations from Dr. Bosch's testimony have already suggested that his command of the English language is not perfect. Other passages might easily be found to confirm this impression.[6] However, the Court finds no indication that his understanding was so deficient as to prevent effective cross-examination. Nor was any evidence presented to support the view that Dr. Bosch was unable to converse with the petitioner effectively. Similarly, no competent evidence was presented which would establish actual prosecutorial bias on the doctor's part, as opposed to a mere appearance or possibility of such attitudes.

■ The Court concludes that Dr. Bosch's personal characteristics and professional connections might reasonably have led Mr. Haupt to select another expert to examine petitioner had the choice been afforded. However, the Court does not find evidence sufficient to support a determination that fair and adequate expert opinion could not be obtained from Dr. Bosch. Similarly, this Court does not believe that a procedure for examination of indigent defendants at public facilities is necessarily so prejudicial to the defendant's rights as to fail constitutional scrutiny. *Satterfield v. Zahradnick*, 572 F.2d 443 (4th Cir. 1978). Nor does the Court believe that an indigent defendant is entitled to repeated psychiatric examination after substantial competent evidence has already been obtained. *United States ex rel. Smith v. Baldi*, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953); *McGarty v. O'Brien*, 188 F.2d 151 (1st Cir. 1951). Obviously, such a holding would allow defendants to engage in endless searches for the "right" diagnosis with considerable expense to the public and only dubious contribution to the legitimate ends of justice.

■ However, in the present case, this Court does not find only objection to a particular psychiatrist or to use of publicly employed psychiatrists *per se*. Similarly, petitioner does not advance any demand for

---

**6.** For example, Dr. Bosch described procedures involved in examination of the petitioner as follows:

The examination that was carried out was divided into two parts. One, the physical examination and then the psychiatric examinations. The following physical examination that shows that he is in good physical health ... And, the psychiatric examination, this is carried out under a personal interview with the patient. And, to solve the mental illness or this emotional problem would be revealed by this psychiatric examination. It was given a diagnosis of what is called a reactive-depressive condition. And, we referred to a condition that was brought about by his arrest and consultation with the charges. T. 90–91.

multiple opinions in the face of already abundant evidence. Here, it appears that no expert opinion at all was received on the central issue of the petitioner's mental state at the time of the alleged crime. It further appears that almost no lay opinion on this critical issue was received. To be sure, this extraordinary situation may be attributed in some part to the defendant's memory lapse. Moreover, this lapse might even be ascribed to a conscious effort to avoid diagnosis. T. 181. Nonetheless, Dr. Bosch testified that Mr. Blake was suffering from genuine mental problems at the time of the interviews and, that these problems included loss of memory and concentration. In such circumstances, the Court cannot easily conclude that Mr. Blake's memory lapse was intentional.

Moreover, it is obvious that the state made little or no effort to supply Dr. Bosch and apparently Mr. Haupt as well with such information as the defendant had already voluntarily provided. The state's failure to produce the transcript of November 15, 1975 was hardly cured by events at trial. Careful analysis of the defendant's statement would surely require more than a single reading. Yet this one reading was apparently the only expert analysis of the petitioner's obviously quite bizarre account of the incident that has ever occurred. The Court finds such analysis wholly inadequate, especially where there is little or no indication that serious efforts were made to obtain petitioner's own first-hand statement after the initial interview had failed. Given petitioner's willingness to discuss the incident on many other occasions, there is no obvious basis for believing that such efforts would have been futile.

The Court finds that, in this case, reasonable efforts were not made to examine the petitioner with respect to his sanity at the time of the alleged crime. The Court further concludes that, even were it impossible to interview the petitioner directly with respect to the incident, reasonable efforts were not made to provide Dr. Bosch with alternative means for consideration of the petitioner's condition. Consistent with this determination, the Court must also conclude that Mr. Haupt was not provided with adequate expert assistance in the preparation of his case. Apparently, he was afforded no professional opinion on the question of Mr. Blake's sanity at the time of the incident until Dr. Bosch's comments were received on the witness stand at trial. At this point, with the presentation of evidence more than half complete and the theory of his defense already outlined for the jury, it was obviously too late for any significant benefit.

The exact parameters of an indigent defendant's constitutional right to expert assistance in the preparation of his defense have not yet been fully developed. *Hoback v. Alabama,* 607 F.2d 680 (5th Cir. 1980). "The right to counsel is an expanding concept in a developing jurisprudence in the sense that new are being brought within its scope as they are reached factually. *Hintz v. Beto,* 379 F.2d 937, 943 (5th Cir. 1967). However, the courts have "long recognized a particularly critical interrelation between expert psychiatric assistance and minimally effective representation of counsel." *United ed States v. Edwards,* 488 F.2d 1154, 1163 (5th Cir. 1974). Thus, in *Bush v. McCollum,* 344 F.2d 672 (5th Cir. 1965), the court upheld habeas corpus relief where a defendant had been sentenced to life imprisonment without benefit of psychiatric testimony. The court thus approved the following language:

> In order for Bush in the instant case to have the effective aid of counsel, it was necessary for his counsel to have the assistance of a qualified psychiatrist and a trial, without expert evidence as to sanity, which found him sane and resulted in a life sentence is so lacking in fairness as to be a denial of liberty without due process of law, contrary to the Fourteenth Amendment.

231 F.Supp. 560, 565 (N.D.Tex.1964).

*Bush* makes clear that the requirement of expert assistance is not met by hasty, inadequate examination any more than the requirement of representation by counsel can be met by placing a warm body at the

defense table. In *Bush*, the defendant was in fact briefly examined by a qualified psychiatrist on two occasions. Nonetheless, the court found that testimony based on these interviews was "not sufficient to permit the jury to form a meaningful judgment as to whether Bush was sane. . . ." 231 F.Supp. 564. Moreover, in *Bush*, the court based its determination that the examination was inadequate upon the opinion of the petitioner's expert witness. In the present case, the inadequacy of the examination, and the impossibility of forming a proper professional opinion were directly admitted by the state's witness and the only expert who has ever testified on defendant's mental condition. Certainly, there can be no doubt that Dr. Bosch's contacts with the petitioner fell far short of the minimal requirement announced in *Bush* that the "examination conducted by the psychiatrists must be of a character they deem sufficient for the purpose of determining the facts required." 231 F.Supp. 564, *quoting Williams v. United States*, 250 F.2d 19 (D.C.App.1957).

This Court is not prepared to conclude, based on the present record, that responsibility for failure to provide complete psychiatric assistance lies solely with the trial court or the prosecution. I am by no means convinced that, if Mr. Haupt had brought the lack of psychiatric information to the attention of the Court prior to trial, arrangements would not have been made for additional examination. Nor is this Court prepared to conclude that Mr. Haupt made all reasonable efforts to provide Dr. Bosch with materials concerning the petitioner which may have been in his possession. However, I do not find it necessary here to precisely delineate the roles of the various actors in this unfortunate chain of events.

The significant point is not what caused this situation but the situation itself. Whatever the source of the circumstances I discuss here, it is apparent that the denial of expert psychiatric assistance was "effectively a suppression of evidence violating the fundamental right of due process of law." *United States v. Pate*, 345 F.2d 691, 695 (7th Cir. 1965). Furthermore, it is apparent that adequate time for preparation was not afforded to counsel for the petitioner. "Time for preparation, where mental competency is in question and there is a fair factual basis as here for the question would at least include a reasonable time within which to have a defendant examined and for preparation of such defense as might be based on the facts developed by the examination." *Hintz v. Beto*, 379 F.2d 937, 941 (5th Cir. 1967). Furthermore, this consideration is due even where the report finds the defendant sane. *Id.* In *Hintz*, time was found inadequate when the defense obtained a report on the morning of trial. Here, the only expert analysis which was received came *during* trial, and, at that, provided no firm conclusion or careful discussion.

Finally, the Court must consider whether prejudice to the petitioner resulted from the absence of expert assistance in the preparation and conduct of his defense. As was indicated above, such a showing has not always been required with respect to ineffective assistance of counsel.[7] Moreover, the present facts do not necessarily appear to fall within the narrow exception to this rule where defense counsel failed to investigate leads favorable to his client. *Davis v. State of Alabama*, 596 F.2d 1214 (5th Cir. 1980). While Mr. Haupt may indeed have

---

7. In *Mason v. Arizona*, 504 F.2d 1345 (9th Cir. 1974), the court applied the same standard applicable to a request for experts in a federal criminal proceeding under 18 U.S.C. § 3006A(e) to state proceedings. Thus, the court required that a habeas petitioner show (1) that counsel had made as complete a showing of necessity as could reasonably be expected in the circumstances and (2) that prejudice resulted from the denial of such assistance. Considering this approach in *Pedrero v. Wainwright*, 590 F.2d 1383 (5th Cir. 1979), the court indicated that

"decisions in this circuit, however, strongly suggest that prejudice will be presumed if the petitioner shows that the matter on which he needed the assistance of experts was seriously in issue." 590 F.2d, at 1391, n.9. Of course, here sanity was "seriously in issue" and presumably the need for assistance was adequately demonstrated pursuant to the request for the evaluation which Dr. Bosch attempted. Yet, no adequate examination or opinion was ever received, as the trial court explicitly recognized. T. 110.

failed to protect Mr. Blake's interests in adequate examination with proper zealousness, this case does not involve any mere isolated action or inaction by the defense counsel. Mr. Blake's trial was in all its essentials a sanity proceeding with the subject's very life hanging in the balance. It seems to this Court difficult if not impossible to say what arguments, or theories, or defenses might have been developed with adequate expert assistance. Mr. Blake received the benefit of no expert help in the preparation of his defense and none in the testing of the prosecution's case. These circumstances seem to the Court to amount to a situation where essentially no defense at all is presented and, hence, no showing of prejudice required. *Hamilton v. State of Alabama*, 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961); *Davis v. State of Alabama, supra.* Alternatively, the Court finds that prejudice has been shown here where (1) sanity is clearly in issue; (2) statements are in evidence which if understood and accepted by the jury would appear to constitute a legal defense; and (3) no firm expert opinion on the import of these statements was received.

### Conclusion

As I have already indicated, the exact dimensions of an indigent's right to expert assistance have not yet been fully developed. A recent decision of the Fifth Circuit has suggested that this right may be substantially identical to the right of defendants to expert opinion and assistance pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See Hoback v. State of Alabama*, 607 F.2d 680, 681, n.2 (5th Cir. 1979). Under *Brady*,

[f]undamental fairness is violated when a criminal defendant . . . is denied the opportunity to have an expert of his own choosing . . . examine a piece of critical evidence whose nature is subject to varying expert opinion . . . The evidence must be both "critical" and "subject" to carrying (sic) expert opinion . . . 'Critical evidence' is material evidence of substantial probative force that "could induce a reasonable doubt in minds of enough jurors to avoid conviction."

*Gary v. Rowley*, 604 F.2d 382 (5th Cir. 1979), *quoting* from *Barnard v. Henderson*, 514 F.2d 744 (5th Cir. 1975) and *White v. Maggio*, 556 F.2d 1352 (5th Cir. 1977). Obviously, Mr. Blake's account of the incident would seem to readily meet these requirements. Thus, if this standard were to be applied, the failure of the Court to appoint "an expert of his own choosing" would in itself amount to a constitutional violation.

However, in the present case, it is unnecessary to go nearly so far. Here, the Court need hold only that, in a capital case, a defendant whose sanity at the time of the alleged crime is fairly in question, has *at a minimum* the constitutional right to at least one psychiatric examination and opinion developed in a manner reasonably calculated to allow adequate review of relevant, available information, and at such a time as will permit counsel reasonable opportunity to utilize the analysis in preparation and conduct of the defense. I so hold. I hold further that these rights were violated in the present case in a manner and to a degree that requires reversal of both the conviction and sentence returned against the petitioner. I further conclude that retrial on the issue of sentence is independently required in the present case by counsel's substantially total failure to prepare and present a defense at this stage of trial.

Petitioner is therefore remanded to the Superior Court of Chatham County for retrial or release within 120 days.

So Ordered.

### CV280–114

Before the Court is a petition for writ of habeas corpus for review of the judgment of the Superior Court of Wayne County, Georgia, and the conviction and sentence of death imposed upon the petitioner. Numerous arguments have been raised with respect to both the finding of guilt and imposition of sentence. For reasons developed below, the Court finds merit only in petitioner's claim that certain defective charges at the sentencing phase may have denied

the jury proper guidance in its deliberations. Petitioner's sentence will therefore be vacated and his case remanded for further proceedings.

### Background

Petitioner Christopher A. Burger was tried before a Superior Court jury in Jesup, Wayne County, Georgia, for the murder of Roger E. Honeycutt, a soldier who, like Mr. Burger, was stationed at Fort Stewart, Georgia. Trial was held on January 23–24, 1978, before the Honorable Robert L. Scoggin. Petitioner was found guilty, and, after a separate sentencing proceeding, the death penalty was imposed. The Supreme Court of Georgia affirmed the finding of guilt by an Order of September 5, 1978. However, the Court also concluded that jury charges with respect to the sentencing phase of the proceedings were defective, and accordingly, the case was remanded for retrial with respect to sentence only. *Burger v. State*, 242 Ga. 28, 247 S.E.2d 834 (1978).

A second trial limited to the question of sentence was held before Judge Scoggin on July 16, 1979, with the death penalty again imposed by the Court on July 19, 1979, pursuant to the second jury's determination. On March 14, 1980, the Supreme Court of Georgia affirmed petitioner's sentence based upon the view that one aggravating circumstance had been properly charged on and found by the jury. Two other aggravating circumstances were invalidated by the Court in light of certain defective charges by the trial judge. *Burger v. State*, 245 Ga. 458, 265 S.E.2d 796 (1980).

Thereafter, petitioner filed for writ of certiorari in the United States Supreme Court. Petition was denied on June 2, 1980. Motion for reconsideration was similarly denied on August 11, 1980. On September 16, 1980, the Superior Court of Wayne County, Georgia, set October 2, 1980, as the date of execution. On October 1, 1980, petition for writ of habeas corpus was filed in the Superior Court of Butts County, Georgia. This action was also dismissed on October 1, 1980. Application for certificate of probable cause to appeal and motion for stay of execution were denied by the Supreme Court of Georgia on October 1, 1980, as well.[1]

The present action was filed in this Court on October 2, 1980. At that time the Court ordered a stay of execution to permit consideration of the various issues raised in the petition. Subsequently, the Court has entertained oral argument from the parties, first at a hearing conducted December 12, 1980, and more recently at another proceeding held on March 7, 1981. At that time, the Court received evidence relating particularly to claims of ineffective assistance of counsel. Certain written materials have also been received and examined by the Court. The results of this analysis are developed below.

### Facts

Christopher Burger was indicted along with Thomas D. Stevens, another soldier at Fort Stewart, for the murder of Roger E. Honeycutt.[2] Evidence developed at trial tended to show that, on September 4, 1977, Burger and Stevens were drinking at a club on post. After exhausting their resources, they decided to raise more money by robbing a taxicab. They then procured a butcher knife and a sharpening tool from the mess hall for use in the robbery and called a cab. They also spoke to a friend and fellow soldier James Botsford. Private Botsford had just arrived at the airport in Savannah after an emergency trip. Petitioner and Stevens agreed to come to the Savannah Airport and bring him back to the base.

Shortly thereafter, at around 10:00 P.M., the victim Honeycutt, who was driving at night to supplement his military income, picked up petitioner and Stevens at Fort Stewart. During the trip to the airport,

---

1. Respondent stipulates that exhaustion of state remedies is not an issue in this case.

2. Mr. Stevens was tried separately, convicted, and also sentenced to death. See *Stevens v. State*, 242 Ga. 34, 247 S.E.2d 838 (1978).

petitioner and Stevens accosted Private Honeycutt with their weapons, forced him to stop the cab, and took sixteen dollars from him. Honeycutt was then placed in the back seat of the taxi, and the trip resumed with petitioner driving.

Petitioner and his confederate continued their search for money in the cab as they drove on to the airport. Stevens moved to the back seat of the vehicle. Private Honeycutt was then forced to disrobe while Stevens searched each article of clothing and then discarded it by throwing it out the window of the car. After Honeycutt had been completely disrobed and no additional money discovered, Stevens forced him to participate in acts of oral and anal sodomy. Subsequently, the victim was placed in the trunk of the cab, still nude, and with his hands tied behind his back.

Petitioner and Stevens then continued to the airport, and picked up Private Botsford. During the drive back to Fort Stewart, they explained what they had done to Botsford in some detail. When Botsford expressed incredulity, they confirmed their story by exchanging brief remarks with Private Honeycutt who could hear and be heard from within the trunk. After some debate, Botsford induced his friends to promise that Private Honeycutt would not be harmed, and, in turn, agreed not to notify the authorities. Later, Private Botsford was dropped off at Fort Stewart. Petitioner and Stevens drove on to Jesup, and finally to a nearby "borrow pit" which was filled with water. After they had wiped their fingerprints from the car and removing a C.B. radio, Mr. Burger raised the trunk lid and asked Private Honeycutt if he was all right. Honeycutt stated that he was. After closing the trunk, Mr. Burger started the car and drove it into the pond, jumping out as it entered the water. The victim was still alive at this time. Thus the autopsy showed drowning as the cause of death.

Petitioner and Stevens then returned to the army base. The next day they contacted Botsford and assured him that the victim had been released unharmed. Private Botsford in turn told them that he had not been to the police. However, on September 12, 1977, Botsford contacted the state patrol and authorities on post after he learned that a local taxi driver had been missing for several days. Shortly thereafter, petitioner and Stevens were picked up by military police. After briefly denying all knowledge of the crime, petitioner made a complete confession and described the incident in detail. He also took the authorities to the pit and pointed out where Private Honeycutt's body could be found. This confession and Private Botsford's testimony were primary sources of evidence in the subsequent trial. Mr. Burger did not testify.

## Issues Presented

Petitioner has alleged approximately fifteen grounds for reversal of his conviction or sentence or both.[3] Certain of these arguments are so plainly inapplicable to the present case as to demand no discussion here. Many points do however merit some review. First, with respect to the guilt-innocence phase of trial, the Court will consider petitioner's claims of constitutional error based upon (1) use of petitioner's confession which was allegedly obtained under circumstances which render it involuntary and, hence, inadmissible; (2) failure to properly advise petitioner of his *Miranda* right to appointed counsel which is also alleged to vitiate the confession; and, (3) certain language in the trial court's charge which allegedly shifted the burden of proof with respect to criminal intent to the petitioner. The Court will next consider other claims of error which impact on both the guilt and sentencing phases of trial: (1) the introduction into evidence in all proceedings of allegedly inadmissible hearsay statements made by Stevens; and, (2) generally ineffective assistance of counsel as allegedly manifested in virtually all aspects of the preparation and conduct of petitioner's de-

---

**3.** Petitioner's motion to permit amendment is thus granted. Arguments raised thereby, which primarily concern *Miranda* warnings and admission of statements by Stevens, are considered and rejected below.

fense. Finally, the Court will review two arguments which relate only to sentencing proceedings against Mr. Burger: (1) the alleged failure of the Georgia Supreme Court to apply a constitutional definition of one aggravating circumstance in its review of the death sentence; and (2) failure of the trial court to instruct fully on the remaining aggravating circumstances.

## Analysis

### (1)

Mr. Burger contends first that his confession was obtained "through the use of psychological coercion, tricks and ploys. Petitioner was not mentally competent to understand his right against self-incrimination, nor was he competent to waive that right." In support of these claims, petitioner relies *inter alia* upon evidence of his sub-normal intelligence, the length and conditions of interrogation, and petitioner's alleged intoxication at the time of questioning. Petitioner also refers to certain defects in the *Miranda* warning given by Fort Stewart authorities, which will be considered separately.

At trial, a hearing into the circumstances of petitioner's confession was conducted out of the jury's presence. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1963). At this *Jackson v. Denno* hearing, testimony was received from investigating officers of the Jesup Police Department and the Fort Stewart Criminal Investigation Division (CID), as well as from an expert employed by the defense to perform various psychological tests on Mr. Burger. The testimony of the various police officers indicated that petitioner was picked up by military authorities early in the evening of September 12th, after Private Botsford had gone to these authorities with his information. Questioning began at about 9:20 P.M. At 9:25 petitioner was read his *Miranda* rights and signed a waiver permitting the interview to continue without counsel. After initially denying any knowledge of the crime, Mr. Burger began detailing the entire incident to investigators. At about 11:10 P.M. he agreed to show the military

police where the cab was, because he could not verbally pinpoint the location. At 11:25 P.M., Mr. Burger and military authorities left Fort Stewart to go to the pond. They reached this pit at 12:34 A.M., remained there about thirty minutes, and then returned to Fort Stewart, arriving back at the CID office around 1:54 A.M. The investigating officer then typed out a four-page confession, which required about an hour and a quarter. The confession was signed around 4:00 A.M., after petitioner had sworn to its accuracy.

It thus appears that petitioner was in custody for perhaps nine hours before he signed the confession. It also appears that he was in contact with no one except law officers during this period. However, the uncontradicted testimony of these officers indicated that petitioner was "alert and coherent" at all times. T. 174. Furthermore, he appeared to understand his rights, but nonetheless preferred to proceed without an attorney. T. 170. There was no reason suggested for believing that he was under the influence of any drug. T. 175. Nor did any testimony suggest that "tricks or ploys" had been used to elicit the statement.

Testimony from petitioner's psychologist did not call these facts into serious question. This expert stated that Mr. Burger does have limited intellectual capacities. Test results indicated an I.Q. of 82 as well as some possible brain damage. However, it was pointed out that these limitations had not prevented petitioner from successfully completing two courses of military training and otherwise functioning adequately in daily life. The psychologist also testified that petitioner's limitations were not so profound as to put him "beyond the concept of understanding right from wrong." T. 250. Furthermore, the psychologist found no reason to believe that the confession had been improperly obtained, or indeed that "tricks and ploys" would have been needed to elicit the statement:

> I think he would enjoy the idea, frankly. This would be a great opportunity to display his psycho-pathological behavior. He'd probably shout in the wind as much

as he could of all the things he might have done.
T. 250.

It appears then that Mr. Burger is a man of limited capacities. However, he was not incapable of normal functioning in his military role. Nor was he beyond understanding the nature and significance of his crime or his confession. It also appears that he was questioned at some length but not against his will or while under the influence of drugs or otherwise incompetent. Considering the "totality of these circumstances" the trial court found that the confession had not been improperly obtained. T. 268. It was thus submitted to the jury for a second determination, which was apparently also unfavorable to the defendant. The present petition suggests no basis for disturbing this determination, and this Court sees none. Therefore, Mr. Burger is entitled to no relief on this point. *LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1972); *Howard v. Maggio*, 540 F.2d 1280, 1282 (5th Cir. 1976); *Branch v. Estelle*, 631 F.2d 1229, 1233 (5th Cir. 1980).

Second petitioner contends that his confession should have been excluded as having been obtained pursuant to an improper *Miranda* warning. This point was also argued at length in the trial court. *See, e. g.,* T. 197–98. Here, as at trial, constitutional error is alleged to have developed out of the unusual circumstances of petitioner's arrest. It is undisputed that petitioner received the standard *Miranda* warnings accorded all military suspects at the time of his first interrogation. This warning informs the suspect that he may have the services of a military attorney at no cost, or, if he so chooses, that he may retain private counsel at his own expense. It is similarly undisputed that, when petitioner was turned over to the Jesup police, he was given a standard civilian warning that a private attorney would be provided for him if he were indigent and so-requested. T. 200. Error is, however, claimed in that military police failed to inform petitioner of his right to free private counsel as soon as they became aware that the homicide might have been committed off-post and therefore, been subject to civilian jurisdiction.

The adequacy of a *Miranda* warning must be viewed in light of the purpose it is intended to serve. There can be little doubt that this purpose is to provide persons in custody under suspicion with legal advice which might enable them to better know and protect their rights and interests. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1965). In the present case, petitioner was afforded access to the only counsel military authorities had power to provide. Similarly, petitioner was accorded the opportunity to obtain civilian counsel by civilian authorities. At no point was Mr. Burger questioned in circumstances where he could not have obtained legal assistance without cost had he so-desired. Furthermore, there is no reason whatever to believe that military counsel would have been any less skillful or diligent than a civilian attorney in protecting petitioner's interests during military interrogation. Petitioner's argument would apparently require that a suspect be offered the advice of counsel who could represent the accused in all circumstances which might develop from the investigation. The Court knows of no authority which would support such a requirement. The Court further concludes that the purposes of *Miranda* are adequately served when a suspect is given access to legal assistance competent to assist him in the questioning then in progress. Petitioner was at all times afforded such protection. Thus, the present argument is without merit.

Third, petitioner contends that the trial court's charges on the issue of intent impermissibly shifted the burden of proof with respect to this essential element of the crime charged. The language thus questioned is as follows:

Now, by definition, ladies and gentlemen, in our State a crime is a violation of a statute of this State in which there shall be a union of joint operation of act, or omission to act, and intention, or criminal negligence. I give you certain presump-

tions of law that are applicable to this case.

A presumption is a conclusion which the law draws from given facts. Each of these presumptions are rebuttable. That is, they are subject to being overcome by evidence to the contrary.

I charge you now the presumptions that are rebuttable. Every person is presumed to be of sound mind and discretion. The acts of a person of sound mind and discretion are presumed to be the products of the person's will. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts. A person will not be presumed to act with criminal intention, but the jury may find such intention upon consideration of the words, conduct, demeanor, motive and all other circumstances connected with the act for which they (sic) accused is prosecuted.

A specific intent to commit the crime charged in this indictment is an essential element that the State must prove beyond a reasonable doubt. Intent is always a question for the jury, and is ordinarily ascertained by acts and conduct. Intent may be shown in many ways, provided the jury finds that it existed from the evidence produced before you. It may be inferred from the proven circumstances, or by acts and conduct, or it may be presumed when it is the natural and necessary consequences of the act.

T. 409–10.

This charge, of course, employs language which has been the subject of lengthy judicial consideration, and, in some contexts, of very severe criticism. *United States v. Sutton,* 636 F.2d 96, 5th Cir., 1981; *United States v. Chiantese,* 560 F.2d 1244 (5th Cir. 1977). However, it is clear from *Chiantese* as well as other decisions that no *per se* rule exists against charging the truism that a person is normally presumed to intend the natural and probable consequences of his actions. 560 F.2d, at 1255–56. Thus, it is

necessary to begin any analysis by determining the type of presumption which is involved. Only then is it possible to ascertain the proper standard for constitutional analysis. *Sandstrom v. Montana,* 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979).

██ It is apparent from examination of the charge at issue that it creates no mandatory presumption. Quite the opposite, the trial court was careful to state and restate the principle that there could be no presumption of criminal intent and that at all times the state had the burden of proving such intent beyond a reasonable doubt. The language in question thus appears to create no more than a permissive inference which the jury was left free to apply or reject as it saw fit in view of all the evidence in the case. Moreover, this interpretation is in accord with analysis of the legal significance of the charge by the Georgia Supreme Court. *See Skrine v. State,* 244 Ga. 520, 260 S.E.2d 900 (1979).[4]

It is therefore appropriate to analyze the present charge under *Ulster County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). In *Ulster County,* the court defined a permissive inference as one which "allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and that places no burden of any kind on the defendant." 442 U.S., at 157, 99 S.Ct., at 2224. The Court then described the test for a constitutional attack on such a presumption:

> When reviewing this type of device the Court has required the party challenging it to demonstrate its invalidity as applied to him. Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the "beyond a reasonable doubt" standard only if, under the facts

4. Even though the Georgia Supreme Court is the final authority on questions of state law, this Court must still ask how a jury might have interpreted the trial court's charge. Here, however, there is no reason to conclude that the jury's interpretation could have departed from that of the Georgia court. *See Sandstrom, supra,* 442 U.S. at p. 516, 99 S.Ct. at p. 2455.

of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation, is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination. 442 U.S., at 157, 99 S.Ct., at 2224 (citations omitted).

The proper question thus becomes whether there was a rational basis under which the jury might infer criminal intent from the defendant's actions with respect to the murder. The evidence, of course, indicated that Mr. Burger raised the trunk lid of the victim's taxicab and specifically asked him if he were all right. Mr. Burger himself then drove the vehicle directly into the pit where it submerged, drowning Private Honeycutt. There can be no real doubt as to whether there exists a rational basis by which the jury could conclude that this course of conduct was intended by petitioner. Furthermore, these circumstances as well as other evidence in the record clearly provide ample basis to support a conviction independent of any presumption. 442 U.S., at 160, 99 S.Ct., at 2226. Nor does it appear that any problem would be created by replacement of the rational relationship test by a more stringent "reasonable doubt" standard. See *Barnes v. United States*, 412 U.S. 837, 842–43, 93 S.Ct. 2357, 2361, 37 L.Ed.2d 380 (1978). Here, it seems entirely clear that the facts upon which the presumption is founded are sufficient to support an inference of intent to kill beyond a reasonable doubt. See *Ulster County, supra*, 442 U.S., at 166, 99 S.Ct., at 2229.

This analysis is supported by review of Fifth Circuit cases considering jury instructions which employ this "natural consequences" language. As was indicated above, these cases make clear that there is no *per se* rule against such an instruction. The real concern is not the phrase "a person is presumed to intend the natural consequences of his voluntary actions." In fact, the Court has specifically approved pattern charges which use these words. *Chiantese,*

*supra*, at p. 1255–56. Error is introduced only when this language is coupled with other phraseology which appears to place some burden of producing evidence on the accused. Thus, the Court emphatically rejects the following language:

It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. *So unless the contrary appears from the evidence*, the jury may draw the inference....

560 F.2d, at 1249. See also *Mann v. United States*, 319 F.2d 404 (5th Cir. 1963) (emphasis added).

When one examines language of the charges in question, it is apparent that no such burden shifting can be inferred. Here the trial court specifically charged that the accused "enters upon the trial of this case with the presumption of innocence and that presumption remains with him throughout the trial and until and unless the State ... convince(s) your minds beyond a reasonable doubt as to his guilt." T. 404. The Court charged further that a "person will not be presumed to act with criminal intention." T. 409. With reference to the "natural consequences" instruction, the Court specifically labeled the presumption "rebuttable." T. 410. Furthermore, immediately after stating it, the Court again indicated that "a person will not be presumed to act with criminal intention." T. 411. Such a statement hardly repeats the error criticized in *Chiantese* and related cases. Similarly, the trial court's concluding reference to "natural consequences" is couched language directly reminding the jury that intent is "an essential element that the state must prove beyond a reasonable doubt," based upon the jury's evaluation of all the evidence before it.

In sum, the trial court's charge does not appear to create any real possibility of impermissible burden-shifting. The situation condemned in *Chiantese, Mann,* and *Sandstrom* is simply not present here. Instead, the challenged instructions specifically remind the jury that the burden of proof remains at all times on the state. These

instructions create only a permissive inference which the jury is left free to accept or reject in accord with its view of the evidence. Furthermore, it appears that this evidence amply supports the inference whether evaluated under a "rational basis" or a "reasonable doubt" test. Accordingly, petitioner's claim of error is without merit.

(2)

Petitioner alleges two other constitutional violations which would impart on both phases of trial. Petitioner contends first that he was denied due process of law by admission of certain hearsay statements by Stevens into evidence. Reference is thus directed primarily to the testimony of Private Botsford. In this testimony, Botsford recounted *inter alia* various remarks made directly to him by Stevens while the petitioner was also present in the taxicab. These statements included references to the armed robbery which the parties had planned and carried out in concert. There was also considerable discussion of the sodomizing of Honeycutt which was apparently Stevens' idea, though petitioner obviously aided this crime by driving the taxi during its commission.

These statements by Stevens were admitted into evidence over objection by counsel. The trial court's ruling was based upon several provisions of state law. In particular, the court appeared to find the disputed remarks admissible as the statements of a co-conspirator during the course of the crime. T. 98. The court apparently considered this argument particularly compelling in view of the fact that petitioner was physically present when Stevens spoke, and testimony that he generally joined in or approved Stevens' statements as they were made. T. 92, 94. Stevens' statements with reference to the sodomizing of Honeycutt were also admitted as showing "res gestae", or the petitioner's motive and course of conduct with respect to the eventual murder. T. 101.

It is claimed, of course, that these statements were inadmissible hearsay under state law and that the trial court's decision to admit was incompatible with fundamental fairness. However, it does not appear that admission of these remarks was in fact violative of any state rules of evidence. With respect to the evidence of sodomy, in particular, it appears obvious that this conduct was indeed part of the same series of events as the murder for which petitioner was charged. It is also obvious that the need to cover up this crime *inter alia* was a motivation for the murder. Thus, the Georgia Supreme Court has held that

> [g]enerally on a prosecution for a particular crime, evidence of another and distinct crime wholly independent from that for which one is on trial is inadmissible; but there are exceptions to this rule. One is, if the separate crime was committed as a part of the same transaction as that for which the accused is being tried, and forms a part of the res gestae.

*Hill v. State*, 201 Ga. 300, 303, 39 S.E.2d 675 (1946).

The Georgia Supreme Court found this rule applicable to the present facts. *Burger v. State*, 242 Ga. 28, 32, 247 S.E.2d 834 (1978). I find no reason to doubt this view. Similarly, I find no reason to question the trial court's rulings with respect to Stevens' other statements made in the course of the conspiracy. Such a determination seems entirely proper under state law. Ga.Code Ann. § 38–306. Furthermore, I can find no basis to support a conclusion that Georgia law with respect to statements of co-conspirators is subject to any constitutional infirmity. In fact, of course, the Georgia rule has been specifically approved by the United States Supreme Court. *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).[5]

---

**5.** *Dutton* approves an application of the Georgia hearsay rule considerably more dubious than anything in the present case. Here, the co-conspirator's statements were generally adopted explicitly by petitioner as they were made. Moreover, Botsford's testimony involved statements during the actual development of the criminal conduct or specific efforts to conceal those actions. In *Dutton*, the court dealt with a statement made over a year after the crime was committed and wholly unrelated to any concealment effort.

Petitioner's second argument for general reversal relates to alleged inadequacies in the performance of counsel with respect to virtually every aspect of the preparation and presentation of his defense. The Court will not attempt to recount all the supposed failings of Mr. Leaphart. However, it appears that this charge involves several major allegations: (1) that a conflict of interests existed because Mr. Leaphart's partner defended Stevens in a later, separate trial; (2) that counsel failed to distinguish in his own mind and the jury's between the actions of the petitioner and Stevens; (3) that counsel failed to adequately investigate, research and present petitioner's *Jackson v. Denno* claim; (4) that counsel failed to investigate or question the composition of the jury, on which blacks and other minorities were in fact underrepresented; (5) that counsel failed to develop mitigating factors with respect to sentence; and, (6) that counsel inadequately presented petitioner's case on appeal.

As was indicated above, this Court conducted an evidentiary hearing relating specifically to these claims. At this hearing, Mr. Leaphart testified at length on the theory and conduct of petitioner's defense. Counsel indicated in substance that his strategy was to force the prosecution to prove all the elements of the case, while raising every objection available under the rules of evidence. Counsel also indicated that he tried at all times to avoid placing the petitioner on the stand because he feared that the jury would find little reason for mercy in petitioner's quite unremorseful attitude toward the crime. Similarly, counsel indicated that he had met with Mr. Burger's mother and discussed the possibility of her or others testifying in mitigation. However, Mr. Leaphart stated that he decided against using such testimony when it became apparent that it could provide little specific positive evidence, even though much unfavorable testimony was likely to emerge on cross examination. Mr. Leaphart also stated that his conduct of the petitioner's case was in no way hampered by his partner's defense of Stevens.

The legal standard with respect to this claim is stated easily enough. Petitioner is entitled to counsel likely to render and in fact rendering reasonably effective assistance. *Jones v. Estelle*, 622 F.2d 124 (5th Cir. 1980). Of course, this standard does not require errorless counsel. *United States v. Johnson*, 615 F.2d 1125 (5th Cir. 1980). Nor is it intended to require that an attorney's performance be ideal in every strategic or substantive particular. It is only necessary that counsel's performance fall within a sphere of reasonable legal skill and practice. When considered in these terms, the Court sees no basis for a finding of constitutional error.

■■■■■ Reviewing first petitioner's allegations of conflict of interest, it is important to note that such a conflict must be actual rather than merely speculative to support relief. *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979). Furthermore, it is clear that not every conceivable conflict is so egregious as to amount to a Sixth Amendment violation. *United States v. Alvarez*, 580 F.2d 1251, 1255 (5th Cir. 1978). In this connection, it is particularly significant that even joint representation of co-defendants need not be a *per se* constitutional violation. *Foxworth v. Wainwright*, 516 F.2d 1072 (5th Cir. 1975). Thus, the present case would hardly demand an inference of error where the two indictees were tried separately by different, if also professionally associated, attorneys. Petitioner has attempted to meet this problem by alleging that Stevens' defense was inconsistent and, hence, that Mr. Leaphart was under some pressure to temper his efforts so as to avoid undercutting his partner's theories.

■■■■ However, Mr. Leaphart's uncontradicted testimony was that the defense of Stevens did not in fact involve inconsistent theories. Moreover, Mr. Leaphart's similarly uncontradicted position was that he in no way tailored his strategy toward protecting Stevens. This testimony is strongly supported by examination of trial record, which shows considerable effort to gain mercy for petitioner by portraying Stevens as the chief architect of the crime. *See, e.*

g., T. 257–62. The present facts thus support no inference of any conflict of interest actual or potential. Neither do they admit an inference of prejudice arising out of counsel's alleged attempt to protect his partner's client. Similarly, it is clear from the trial record that Mr. Leaphart did not confuse petitioner's conduct with Stevens'. Quite the opposite, counsel objected repeatedly to Botsford's tendency to confuse the words of the two men. *See, e. g.,* T. 95, 98, 101, 106. Moreover, at petitioner's retrial, Mr. Leaphart used a chart specifically detailing the acts of each man in a direct effort to convince the jury of petitioner's lesser role in the various crimes. Plaintiff's Exhibit 1.

▆▆▆ The Court is likewise unable to conclude that Mr. Leaphart failed to conduct proper research and investigation in the preparation of petitioner's defense at trial or on appeal. In fact, the trial record shows that Mr. Leaphart cited numerous authorities to the court in support of his arguments with respect to the evidence and the admissibility of the confession. *See, e. g.,* T. 264. Counsel also presented these arguments on appeal and in fact, of course, gained a partial reversal. Petitioner has offered no basis for concluding that additional measures were appropriate or would have been efficacious in any way.

▆▆▆ Much the same situation prevails with respect to petitioner's claim of constitutional error in failure to investigate or challenge jury composition. There has been no showing made that such efforts were within the range of essential defense strategies and no showing that any useful result would have been achieved. Moreover, there is good reason to doubt both propositions in view of the fact that petitioner is white and, as a stranger to the community, not obviously subject to any particular local prejudice. Furthermore, according to Mr.

Leaphart's uncontradicted testimony, the actual composition of the jury panel did not appear to reflect any such underrepresentation.

The Court is much more concerned by petitioner's allegations of ineffective assistance of counsel with respect to sentencing. Petitioner contends that Mr. Leaphart failed to interview him adequately so as to develop available mitigating factors. Petitioner also alleges that Mr. Leaphart failed to develop or use mitigating evidence which could have been obtained particularly from Mr. Burger's mother, Mrs. Betty Foster, who was present at trial and retrial. In support of these claims, petitioner offered testimony from Mrs. Foster in which she described at length the obviously quite unstable, unhappy home life Mr. Burger experienced as a child. Petitioner also offered a number of affidavits from childhood associates of the petitioner which similarly noted the difficulties he experienced as a youth and asked mercy in his behalf. Petitioner thus attempted to show that favorable evidence was available and, hence, that Mr. Leaphart's performance did not amount to harmless error. See *Davis v. Alabama,* 596 F.2d 1214 (5th Cir. 1980).

As was indicated above, Mr. Leaphart made a strategic decision in his conduct of the case to avoid revealing information concerning the petitioner's character to the maximum extent possible. Mr. Leaphart decided against calling petitioner to testify particularly because he feared that the jury would react adversely to Mr. Burger's "indifference" toward his crime and his generally "sadistic" attitude. Counsel also indicated that he had discussed the possibility of her testifying with Mrs. Foster several times, but decided against this, too, to avoid revealing violent conduct in petitioner's past.[6] Mr. Leaphart acknowledged that his strategy meant that some perhaps helpful

---

**6.** Mrs. Foster testified that Mr. Leaphart made only very minimal efforts to discuss petitioner's case with her and to develop possible mitigating factors. Mr. Leaphart's account suggested that he had talked with Mrs. Foster several times and made adequate if hardly ideal inquiries. Mr. Leaphart's account is supported by

his bill, which lists two conferences totaling three and a half hours prior to trial and four conferences of unstated duration prior to retrial. Defendant's Exhibits 1, 2. Thus, the Court must conclude that Mr. Leaphart's investigation appears to meet at least minimal professional standards.

information would not reach the jury; but, he felt nonetheless that a more complete presentation would have produced an "end result not to his benefit."

This Court is well aware of the extraordinary difficulty associated with deciding whether to offer character evidence in a capital case. When counsel decides to adduce none, a claim of ineffective assistance is all but guaranteed. On the other hand, when evidence is offered, the chance to make opening and closing arguments is lost. Moreover, counsel is without power to prevent the jury's hearing evidence of bad character which his witnesses may also possess. In the present case, all these considerations seem to have been reviewed by counsel in making his necessarily difficult decision. It further appears that Mr. Leaphart made a much more than merely adequate effort to gain maximum advantage from his choice. Thus, he, in fact, offered an extended and, at points, quite imaginative argument [7] for Mr. Burger. In this argu-

ment, counsel made full use of the lack of any evidence of prior violent crime by Mr. Burger. T. 426–27.

Thus, this Court has the task of weighing a strategic decision which was reached with at least some awareness of the relevant facts and then carried out in a manner which clearly meets "reasonable" professional standards. In this connection, petitioner has made much of the alleged benefits have accrued had Mrs. Foster and others been called to testify. However, it seems obvious that Mrs. Foster's testimony would surely have robbed petitioner of perhaps the major argument in his behalf, *i. e.,* counsel's claim that "[t]his is a man who has never, as far as the evidence in this case is concerned, never been in any trouble in his life." T. 426. Petitioner's case would have been supplemented only to the extent of a declaration of maternal love from a woman whose own background and conduct was far from ideal.[8]

7. Now, you get back down to capital punishment and the reason for capital punishment. The District Attorney has alluded to the "eye for an eye, and a tooth for a tooth", "life for life". Well, that is the old Jewish law, and still is the Jewish law, and is still the law as the Moslems carry out in the desert communities in the Arabian deserts and places of that nature, where they live in tribes and move from place to place.

The reason for the Mosaic Law and the reason, one of the basic reasons for that harsh justice that was imposed by the earlier Jews in their march from Egypt to they finally got to the Promise Land was the fact that they would not stay long in one place, that they couldn't put up with prisoners. They couldn't—they had no way to house prisoners. So when you did something wrong, when you stole something from somebody, when you got in a fight with somebody and put out somebody's eye, or when you killed somebody, well, they just said, "well, you've killed him, so that's it. Blam, because we don't have time to fool with you, because we've got to be on down the road about another thirty or forty miles tomorrow and we have no place for you."

They needed the swift tribal justice. And, that swift tribal justice, if you read in the papers, is still being carried in Saudi Arabia, and places like that, because these people still move about in the same manner that Moses and them moved about thousands of years ago.

After the Jewish people settled in what is now Israel or the Promise Land, they went

from an urban—from a tribal society which moved about to a—from tribal to nomadic society, to an urban society, and they built houses, and communities, and they lived in one place. And, at that time they began to build prisons, and places of punishment and confinement for people who committed crimes.

They no longer cut their hands off, or put out their eyes, or chopped their heads off if they did certain things. They began to an urban way of life. And, with the help of the Romans they progressed up until the time of Jesus Christ.

Now, Christ came along and brought in the idea that "wait a minute, we don't need this old attitude of an eye for an eye, and a tooth for a tooth.... T. 428–29.

8. Similarly, the Court notes that the affidavits supplied by the petitioner do contain references to a difficult childhood which might have created some sympathy for Mr. Burger. However, there are also many details which would support inferences extremely unfavorable to his cause. Thus, one hometown associate refers to "when Chris got into trouble and was on juvenile probation." Affidavit of Phyllis Russell. Another states that "[s]ometimes he would be a nice, normal guy, then at times he would flip out and would get violent over nothing." Affidavit of Earnest R. Holtsclaw. Another refers to possible serious drug abuse. Affidavit of Ruth Alton.

In sum then, the Court must conclude that the evidence available to petitioner was in fact much as Mr. Leaphart believed. Some favorable testimony could probably have been adduced, but any good impact would surely have been at best much obviated by unfavorable information which would also have been revealed. Mr. Leaphart balanced these factors and determined that petitioner was best served by retaining closing argument and then exercising this privilege unencumbered by evidence of petitioner's prior misdeeds. This decision may or may not have been "right." Certainly, if the test is the jury's ultimate decision, it was not. But, this Court cannot say that it amounted to error of constitutional dimensions. I cannot conclude that petitioner was not afforded "reasonably effective" assistance of counsel.

### (3)

There remain before this Court only two allegations of error, each relating exclusively to the sentencing trial, or, more accurately, retrial. Petitioner first attacks the jury's finding that the offense was "outrageously or wantonly vile, horrible or inhumane in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga.Code Ann. § 27–2534.1 b(7). Petitioner contends in particular that this provision is too broad and vague to channel jury discretion adequately and further that, in reviewing petitioner's sentence, the Georgia Supreme Court failed to supply a limiting construction which might have met the problem of overbreadth as applied to the present facts.

Of course, this argument is derived from the Supreme Court decision in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1979). In *Godfrey* the court did indeed find the errors petitioner claims here with respect to b(7). However, it is obvious from the analysis employed by the Court that b(7) is not to be considered unconstitutionally vague in all circumstances. In fact, the plurality opinion finds it unconstitutional only as applied to the particular facts in question and only then after an analysis of limiting definitions which had been or might have been used with respect to b(7).

Of particular interest here is the Supreme Court's view of the standard applied by the Georgia Supreme Court to b(7) cases prior to 1977:

> [T]he Georgia Supreme Court had by 1977 reached three separate but consistent conclusions respecting the (b)(7) aggravating circumstances. The first was that the evidence that the offense was 'outrageously or wantonly vile, horrible or inhuman' had to demonstrate torture, depravity of mind, or an aggravated battery to the victim. The second was that the phrase 'depravity of mind' comprehends only the kind of mental state that led the murderer to torture or to commit an aggravated battery before killing his victim. The third, derived from *Blake* alone, was that the word 'torture' must be construed in para materia with 'aggravated battery' so as to require evidence of serious physical abuse of the victim before death.

446 U.S., at 431, 100 S.Ct., at 1766 (Stewart, JJ.).

Thus, while *Godfrey* is hardly a model of clarity, it appears that the plurality opinion at least implicitly approves sentencing reviews which can be said to apply this limiting standard. It appears also that, if petitioner's crime can be said to fall within these parameters, no constitutional error is to be found in the jury's determination that b(7) was satisfied. Of course, the present case involves many circumstances which may readily be seen as involving "torture" and reflecting "depravity of mind." There was ample evidence upon which the jury might have found that petitioner aided and abetted in Stevens' sodomizing the victim prior to his death. Serious sexual abuse has been equated with "torture" under Georgia law. *House v. State*, 232 Ga. 140, 205 S.E.2d 217 (1974). Similarly, serious physical abuse can readily be seen in the confining of the victim in the car trunk for a period of hours, bound, nude and certainly anxious in the extreme over his captors'

intentions. Likewise, there can be little argument but that petitioner's sadistic inquiry into Private Honeycutt's condition prior to submerging the taxi well-demonstrated "depravity of mind" and, further, that the victim's horror as the trunk inexorably filled amounted to "torture." Certainly, there is little similarity between the circumstances of this crime and the "domestic murders" considered by the Supreme Court in *Godfrey*.

This Court concludes that the evidence here readily supported the jury's finding of aggravating circumstance b(7). Likewise, there can be no doubt that there was evidence sufficient to support the jury's finding with respect to the two remaining aggravating factors, *i. e.*, that it was committed in the course of other capital crimes, namely, kidnapping and armed robbery. However, the Georgia Supreme Court nonetheless found error in the trial court's charge with respect to these factors. *Burger v. State*, 245 Ga. 458, 265 S.E.2d 796 (1980). Noting that the jury instructions had included no description of the elements of kidnapping and armed robbery, the Georgia court held that

> [w]here a defendant in a capital case is not charged during the guilt-innocence phase with the capital felony designated as an aggravating circumstance, the trial court would be required to charge the definition of that capital felony as part of its instruction to the jury during the sentencing phase of the trial, unless such charge has been waived.

245 Ga., at 461, 265 S.E.2d 796.

The Georgia Supreme Court also noted that the trial judge referred to kidnapping as a capital crime, without adding that this is true only where there is bodily injury to the victim or the crime is for ransom.

The Georgia Supreme Court thus found that the jury's determination with respect to these two factors was flawed. Nonetheless, the Court held that petitioner's death sentence need not be reversed because b(7) had been properly charged and found:

> Where two or more aggravating circumstances are found by the jury, the failure

of one circumstance, or in this case two, does not taint the proceedings so as to invalidate the other aggravating circumstance found and the sentence of death based thereon ... the verdict may be upheld upon this ground and the failure to properly charge the other aggravating circumstances does not render the jury's verdict invalid.

245 Ga., at 462, 265 S.E.2d 796.

This Court is, of course, bound by interpretations of state law from the Georgia Supreme Court. *Sandstrom v. Montana*, 442 U.S. 510, 516, 99 S.Ct. 2450, 2455, 61 L.Ed.2d 39 (1979). Thus, it is established that the trial court in petitioner's case did indeed fail to follow the state capital punishment statute properly. However, the Georgia court's further conclusion that this finding did not necessitate reversal of petitioner's sentence raises significant constitutional issues that this Court must review independently. In particular, the Court must consider here whether the jury which handed down the death penalty was sufficiently guided in its deliberation to comply with the constitutional standard set forth first in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

Petitioner argues that the jury's verdict was based upon all three aggravating factors. Thus, it is contended that there is no way to determine to what degree the jury was influenced by the erroneous instructions. Petitioner relies here primarily upon the holding of the Fifth Circuit in *Stephens v. Zant*, 631 F.2d 397 (5th Cir. 1980). In *Stephens*, the jury had considered four possible aggravating factors, and found three in fact present. On this basis, the jury returned the death penalty. However, the Georgia Supreme Court subsequently held that one of these factors, relating to defendants "having a substantial history of serious assaultive criminal convictions" was unconstitutionally vague. Ga.Code Ann. § 27–2534.1(b)(1). *Stephens v. State*, 237 Ga. 259, 227 S.E.2d 261 (1976). The Georgia court nonetheless found the sentence still valid based upon the same logic applied to

petitioner here.[9] In *Stephens*, the Fifth Circuit reversed. The Court began its analysis by noting prior Supreme Court opinions which established that, if a jury is instructed to consider several grounds for conviction, one of which later proves to be unconstitutional, and the reviewing court cannot determine thereafter whether improper grounds were relied upon, the verdict must be set aside. *Stromberg v. California*, 283 U.S. 359, 367–68, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931). *Accord, Bachellar v. Maryland*, 397 U.S. 564, 570–71, 90 S.Ct. 1312, 1315–16, 25 L.Ed.2d 570 (1970); *Street v. New York*, 394 U.S. 576, 585–88, 89 S.Ct. 1354, 1362–63, 22 L.Ed.2d 572 (1969); *Yates v. United States*, 354 U.S. 298, 311–12, 77 S.Ct. 1064, 1072–73, 1 L.Ed.2d 1356 (1957).

The Court further observed that this principle applied with particular forces to capital cases. The Court thereby noted that under *Furman* the death penalty cannot be imposed under "sentencing procedures that create a substantial risk that the penalty will be inflicted in an arbitrary and capricious manner." 631 F.2d, at 406. Instead, the Constitution demands that a jury's discretion be channelled by objective standards which "make rationally reviewable the process for imposing a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (opinion of Stewart, Powell, and Stevens, JJ.).

Applying these considerations to the facts in *Stephens*, the court concluded that the jury's discretion had not been adequately directed and further that the resulting sentence was not subject to "rational review" as constitutionally required. The Court based this holding upon several grounds. First, it seemed at least possible that jurors would have found the factors properly before it insufficient to support the death penalty without the presence of the third, unconstitutional bases. Second, the court found that the presence of the third aggravating factor enabled the jury to consider prior convictions which would otherwise not have been before it.[10] Third, the court found that the presence of this improper factor may have directed particular attention to the defendant's prior convictions. The court thus concluded that

[i]t cannot be determined with the degree of certainty required in capital cases that the evidence of those convictions, together with the instruction, did not make a critical difference in the jury's decision to impose the death penalty.

631 F.2d, at 406.

Respondent has opposed application of this analysis on several grounds. It is contended first that *Stromberg* and other cases relied upon by the *Stephens* panel are inapposite because each involved a general verdict. In the present instance, any one aggravating factor would be sufficient to support the jury's verdict. Thus, it is contend-

**9.** *Burger v. State* cites as authority for the conclusion here under review the case of *Stephens v. Hopper*, 241 Ga. 596, 247 S.E.2d 92 (1978).

**10.** The Court must point out that in *Gregg* the plurality expressed the following views on the scope of the evidence to be considered in the sentencing procedure:

We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. See, *e. g., Brown v. State*, 235 Ga. 644 [220 S.E.2d 922] (1975). So long as the evidence introduces and the argument at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it is desirable for the jury to have as much information

before it as possible when it makes the sentencing decision.

428 U.S., at 203–4, 96 S.Ct., at 2939 (Stewart, Powell, and Stevens, JJ.). In *Brown*, the Georgia Supreme Court notes that "evidence of general bad character could be admitted in those cases when the defendant had been notified prior to trial that such evidence would be presented." 235 Ga., at 649, 220 S.E.2d 922. Included as permissible evidence of bad character were "prior criminal convictions, and pleas of guilty or pleas of nolo contendere. . . ." 235 Ga., at 648, 220 S.E.2d 922. Thus, it appears that prior convictions could have been placed before the jury even in the absence of the unconstitutional aggravating factor. It further appears that under *Gregg*, no constitutional problem is thereby created. See also 428 U.S., at 163–164, 96 S.Ct., at 2920.

ed that as long as one factor remained valid, there was no basis for reversal. Second, respondent points out that in *Stephens* the court considered an unconstitutional aggravating factor, whereas the present case relates only to an incomplete charge. Respondent also finds indications that the Supreme Court sees no problem in this area in several recent actions. Respondent relies particularly on the denial of certiorari in *Westbrook v. Balkcom,* —— U.S. ——, 101 S.Ct. 541, 66 L.Ed.2d 298 (1980). *Westbrook* involved a defendant sentenced to death pursuant to a finding of b(7) and one other aggravating factor. Dissenting from the denial, Justice White specifically opined that "[t]he imposition of the death sentence, despite a failure to sustain all of the aggravating circumstances found by the jury, does not conflict with either *Stromberg v. California* or *Street v. New York*." (dissenting opinion). Similarly, Justice Stevens wrote that the Georgia Supreme Court's view was "consistent with the Court's decisions." (concurring opinion).

Respondent's arguments are not without force. At the least, some significant support for the position of the Georgia court has been located on the United States Supreme Court. However, it is obviously true also that these are the views of only two justices, and further that their position is counterbalanced by Justice Stewart who supports and even expands the *Stephens* rationale:

Georgia law would prohibit a further finding that the error was harmless simply because of the existence of the other aggravating circumstance. Under Georgia's capital sentencing scheme, the trial court is the sentencing authority. Ga. Code Ann. §§ 27-2503(b), 27-2534.1(b). In addition, the sentencer has the power to decline to impose the death penalty even if it finds that one or more aggravating circumstances are present.

— U.S. ——, 101 S.Ct. 541, 66 L.Ed.2d 298 (1980).

Furthermore, it does not appear that respondent's remaining arguments can be given significant weight. *Stephens* does involve an aggravating factor which was found to be unconstitutionally vague on its face. However, the Georgia statute itself was approved only insofar as it was applied properly. *Gregg v. Georgia*, 428 U.S. 153, 198, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1975) (Stewart, Powell, and Stevens, JJ.). Thus, the failure to adequately adhere to its strictures would appear to amount to error of constitutional dimensions in the present case and, indeed, generally. *Gregg* seems to leave no "gap" between constitutional and statutory error. At the least, constitutional error would certainly develop where error under state law created the "substantial risk" of the arbitrariness, which was prohibited by *Furman* and found present in *Stephens*.

Similarly, the distinction between general and special verdicts in the peculiar context of capital punishment avails respondent little. The Georgia statute does require a specific finding of aggravating circumstances, but the jury is, of course, free to decline to impose death even where such aggravation is present. Thus, the removal of a specific factor would not vitiate a finding of other factors, but it might well alter a jury's ultimate determination of death, which is after all the subject of appellate review. While the jury may be seen as returning a special verdict as to the presence or absence of particular circumstances, its ultimate determination of death is nonetheless general because it is not dictated by these factors, but only *permitted* under them. This Court concludes then that, even in the absence of *Stephens*,[11] the important question is not whether the jury *could* have imposed death without the improper charge, but whether it in fact *did* impose sentence based in some part on this consideration. More particularly, the Court must consider whether "substantial risk" of unguided discretion was created and whether "rational" appellate review was thereby precluded.

---

11. The value of *Stephens* as precedent is somewhat diminished by respondent's motion for rehearing and rehearing en banc. This motion was filed December 8, 1980.

■ The present case is certainly not identical to *Stephens*, but the facts here point to no different result. The Court notes first that the lone remaining factor, b(7), has been specifically criticized for the at best slight guidance which it provides for a sentencing jury. In *Godfrey*, b(7) is referred to as creating grave risk of "standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically unstructured jury." (Stewart, Blackmun, Powell, Stevens, JJ.). To be sure, there is no holding that b(7) is unconstitutional *per se*. But, nonetheless, the fact that the sole proper instruction received by the jury related to this admittedly quite vague factor can only heighten the Court's awareness of the danger of an unconstitutionally arbitrary sentencing decision.

Much more important, however, is the fact that the major thrust of Mr. Leaphart's closing argument was directed toward portraying Stevens as much the more active participant in the crimes which preceded the murder and provided the improperly charged aggravating factors. Such an argument is plainly not frivolous in view of the many Georgia cases which accord different sentencing treatment to a "triggerman" as against his accomplice, despite the fact that the technical legal status of each is the same. *See, e. g., Thomas v. State,* 246 Ga. 484, 272 S.E.2d 68 (1980). Obviously, an essential basis for considering the relative complicity of petitioner and Stevens in these crimes would be some defini-

tion of the precise legal elements of each. Full description of these crimes would surely have permitted a far more informed evaluation of the relative fault of petitioner and Stevens. Without such an explanation this Court cannot say whether the jury simply rejected the distinctions advanced by Mr. Leaphart or whether they were never properly considered because the jury lacked proper foundation for such a review. In many circumstances, the Court might be willing to resolve doubts such as these against petitioner. However, in a capital case especially, this Court is unwilling to label such doubts as insubstantial. I must conclude that a "substantial risk" of impermissible discretion was created by the trial court's charge. I must also conclude that this risk makes "rational" review of the jury's decision impossible.[12]

### Conclusion

The Court has herein considered a lengthy assemblage of alleged errors. These arguments are in overwhelming part insubstantial if not in fact frivolous.[13] It does not appear to this Court that petitioner's trial was in any significant way unfair. The Court most definitely finds no basis for concluding that Mr. Leaphart's representation was constitutionally inadequate. However, I do find that the sentencing phase of petitioner's trial was flawed in a way that may have prevented an informed process of jury deliberation and appellate review. Since it cannot be said that this possibility is not substantial, petitioner must be re-

12. The Court notes also that there is basis in the trial record for believing that the jury's decision may have been a close one. In the first sentencing trial, the jury in fact returned after some period of deliberation to ask the trial court what parole chance the petitioner would have were he sentenced to life imprisonment. T. 438. Thus, it appears that there was some sentiment for not imposing the death penalty despite the obviously extreme nature of the crime and the equally obvious availability of aggravating factors to support such a result. At least, in the minds of this first jury, which was charged similarly to the second, T. 434, petitioner's case does not seem to have been viewed as an "open and shut" case.

13. This Court is particularly concerned by arguments raised with respect to ineffective assistance of counsel. I certainly do not question the wisdom or the propriety of advancing every legitimate argument on petitioner's behalf. However, many, if not all, the allegations made against Mr. Leaphart are directly contradicted by the record. Thus, they could not possibly be of any benefit to Mr. Burger. On the other hand, the raising of such unfounded charges must have a significant "chilling effect" on the willingness of experienced attorneys, like Mr. Leaphart, to undertake the defense of capital cases. Petitioner's attorneys here might do well to reconsider their apparent policy of routinely attacking the performance of trial counsel in light of this fact.

manded to the Superior Court of Wayne County for further proceedings not inconsistent with this opinion.

So ordered.

## CV478–309

Before the Court is a petition for writ of habeas corpus for review of the judgment of the Superior Court of Jefferson County, Georgia, and the conviction and sentence of death imposed upon the petitioner. Numerous arguments have been raised in support of this petition. All matters properly before the Court are considered below. After this review, the Court sees merit in only one: petitioner's claim that the penalty of death is cruel and unusual as applied to him in light of the circumstances of the crime and other relevant factors. Because this Court cannot conclude that the death penalty was appropriately reviewed by the Georgia Supreme Court or that such a review could support capital punishment under the facts of this case, petitioner's sentence of death must be vacated, and the case remanded for further proceedings.

### Background

Petitioner was indicted by a grand jury in Jefferson County, Georgia, for the April 2, 1974 malice murder and armed robbery of Fredger Stapleton, an elderly black man and the uncle of an acquaintance of Mr. Moore. At a hearing conducted before Judge Walter C. McMillan, Jr. in the Superior Court of Jefferson County on June 4, 1974, petitioner waived trial by jury with respect to both guilt and sentence and entered a plea of guilty to all charges. Sentencing was postponed until July 17, 1974. At that time, Judge McMillan handed down the death penalty which is the subject of the present review.

The Supreme Court of Georgia affirmed petitioner's conviction and sentence in a *per curiam* opinion, with one justice dissenting, on February 12, 1975. On March 4, 1975, the Georgia court also denied a timely petition for rehearing. *Moore v. State*, 233 Ga. 861, 231 S.E.2d 829 (1975). Petition for writ of certiorari was denied by the United States Supreme Court on July 6, 1976. *Moore v. Georgia*, 428 U.S. 910, 96 S.Ct. 3222, 49 L.Ed.2d 1218 (1976). Petition for rehearing was similarly denied on October 4, 1976. *Moore v. Georgia*, 429 U.S. 873, 97 S.Ct. 190, 50 L.Ed.2d 154 (1976).

Thereafter, petitioner filed an action for declaratory judgment in the Jefferson County Superior Court seeking a new sentencing proceeding. Relief was denied and that denial affirmed by the Georgia Supreme Court. *Moore v. State*, 239 Ga. 67, 235 S.E.2d 519 (1977). Petition for writ of certiorari to review this determination was likewise rejected by the United States Supreme Court. 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 159 (1977).

After the failure of this action for declaratory relief and also denial of a motion for withdrawal of his guilty plea, petitioner filed for writ of habeas corpus in the Superior Court of Tattnall County. An evidentiary hearing was held on March 30, 1978, and, on July 13, 1978, the court denied all relief. On October 17, 1978, the Supreme Court of Georgia denied application for a certificate of probable cause to appeal.

Mr. Moore's first petition for writ of habeas corpus before this Court, Civil Action No. 478–224, was dismissed voluntarily without prejudice after the Supreme Court of Georgia granted a stay of execution. Subsequently, petitioner's execution was rescheduled for December 4, 1978. The present action was filed November 22, 1978. At that time, Mr. Moore was again granted a stay of execution to permit consideration of the various arguments which were alleged as grounds for relief.

### Facts

At the time of the homicide in question here, petitioner was an enlisted man in the United States Army, where he had served in several capacities, including as a military policeman. In connection with his military service, Mr. Moore met George Curtis, who was a nephew of the victim Fredger Stapleton. Curtis told the petitioner that Mr. Stapleton kept a large sum of money at his

home. Mr. Moore and Curtis first planned to rob the decedent together. Petitioner described their plan and subsequent developments as follows:

> We planned this, he wanted to burn his uncle up, he would get the money and burn him up in the house, and we went over there and Curtis got scared after he went into the house, that was the first time, we was drinking, we had been drunk ... we went over to the house, we went to the back door, and we got in between one of the bedrooms and the front room, there was a locked door, we left and went back over to Curtis' house, he left and I went back over there. I didn't have no intention of killing him. When I went in there, he came out there with a shotgun and hit me in the leg, it scared me, made me shoot him. . . .

Hearing of July 17, 1974, at 48.

It thus appears that late in the evening of April 2, 1974, Mr. Moore reentered the Stapleton home through a bedroom window. Petitioner was armed with a .38 caliber pistol which he had taken out of the car especially to use in the event he encountered opposition. State Habeas Hearing, at 26. After gaining entrance, he was surprised by Stapleton, who came out of his bedroom and fired a shotgun at petitioner. Mr. Moore was not struck by the blast, though he was hit by the barrel of the gun itself. He then fired four or five shots at Stapleton, who was hit and killed by two bullets which struck him in the chest.

After the shooting, petitioner removed two billfolds from the victim's pockets and took the shotgun. He exited Stapleton's home through the front door and left the area in his car, which was parked nearby. The money taken from Stapleton totaled about $5,700. All was surrendered to police at the time of petitioner's arrest as was the shotgun and other evidence. In fact, Mr. Moore generally cooperated with police and made no attempt to conceal his guilt. *See* Hearing of July 17, 1974, at p. 54.

## Questions Presented

In his initial petition, Mr. Moore alleged the following constitutional violations: (1) failure to transcribe closing arguments at sentencing prevented adequate appellate review of the basis for the death penalty; (2) petitioner was not informed that malice-murder required intent and, thus, his plea was not knowingly and intelligently made, nor did it include any admission of intent; (3) petitioner was not informed of his right to withdraw his plea prior to filing of sentence because of ineffective assistance of counsel;[1] (4) the Georgia Supreme Court failed to carry out an adequate review of the propriety of a death sentence given the nature of the crime and the criminal.

By an amendment filed *pro se* on March 6, 1979, Mr. Moore added several other allegations of error. In particular, Mr. Moore claimed ineffective assistance of counsel in his attorney's alleged failure to (1) investigate and challenge the composition of the grand jury which indicted him; (2) inform petitioner that the grand jury could be challenged; (3) investigate local prejudice and seek a change of venue; and (4) have closing arguments transcribed. Mr. Moore also alleged error by the Georgia Supreme Court through use of an improper sample of cases in assessing the proportionality of his sentence.

On June 18, 1979, oral argument was held in this case before Honorable Curtis Ford, United States Magistrate, at Reidsville, Georgia. Petitioner was represented there by Mr. James C. Bonner who had also represented him in the prior state habeas proceeding. At this hearing, Mr. Bonner indicated that factual issues had generally been "fairly developed on the record" in the state habeas action. State Habeas Hearing, at 3. Thus, Mr. Bonner informed the Court that only the four issues stated in the initial petition for habeas corpus were before it,

---

1. Of course, all arguments relating to error prior to entry of petitioner's plea of guilty, except ineffective assistance of counsel, were waived by that plea. *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1972). Thus, each of petitioner's first three points can be considered only in terms of counsel's performance.

and that these issues probably would not require an evidentiary hearing. Furthermore, Mr. Bonner directed the overwhelming majority of his argument "most particularly [to] whether or not [petitioner's] specific death sentence and the unique circumstances of his case constitute cruel and unusual punishment under the Eighth and Fourteenth Amendments." *Id.*

Subsequent to this proceeding, Mr. Bonner requested leave to withdraw. This motion was granted by the Court, with Ms. H. Diana Hicks appointed as substitute counsel in October, 1980. Since entering the case, Ms. Hicks has moved that the Court permit still another amendment to the petition. This amendment generally restates arguments already before the Court. However, it would change the present pleadings by deletion of reference to ineffective assistance of counsel with respect to seeking a change of venue and challenging the composition of the indicting grand jury. The recast petition would also add allegations of error with respect to use of a presentencing report without prior examination by the petitioner and also a general argument that capital punishment is without theoretical justification and, hence, unconstitutional.

Respondent has objected to both the *pro se* amendment and the proposed amendment now before the Court. Respondent contends that the *pro se* amendment is improper in that it raises matters not brought before the state habeas court. However, respondent does not suggest dismissal for failure to exhaust state remedies, since a second state habeas action would surely be dismissed as successive. Ga.Code Ann. § 50–127(10); *Brown v. Ricketts*, 233 Ga. 809, 213 S.E.2d 672 (1975). Instead, respondent argues that this pleading should be struck as involving matters which the petitioner deliberately bypassed. Similarly, respondent contends that no further amendment should be permitted, since the errors alleged in the amendment were certainly known to petitioner's counsel when this suit was filed, now over two years ago.

This Court is, of course, well aware that amendment is to be "freely given when justice so requires." Rule 15(a) F.R.Civ.P. Nor would the Court doubt that this general principle is due particular fidelity in a capital case such as the present action. Nonetheless, the Court can see no sound reason for permitting further amendment at this late stage of the present case. As respondent points out, the petitioner here has been represented by counsel at all times. Furthermore, counsel made explicit reference to the presentencing report issue in the original habeas petition, thus demonstrating beyond doubt that this matter had been considered by him and rejected as a basis for relief before this Court. Counsel's decision cannot be seen as unfounded. This question was considered at length by the state habeas tribunal. Testimony was received from Mr. Pierce and an affidavit was introduced from the officer who prepared the report. Upon examining this evidence and the trial transcript, which appears to show that the report was turned over to Mr. Pierce, *see* Transcript of July 17, 1978, at 27–28, the Court ruled adversely to the petitioner. No new evidence has been suggested which would cast doubt on this determination. Thus, the Court can find no basis for concluding that any sound reason exists to allow new counsel to resurrect this question. Motion to amend with respect to this argument is therefore denied.

The second proposed additional argument for relief here is even more dubious. There is, of course, no authority for the proposition that the death penalty is unconstitutional *per se* as petitioner would argue in effect. In fact, the Supreme Court has at all points specifically rejected this broad proposition, while, of course, also requiring that "if a state wishes to authorize capital punishment it has a constitutional duty to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1979) (Stevens, Stewart, Powell, Blackmun, JJ.). Petitioner's amendment is therefore denied on grounds of futility. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

With respect to the *pro se* amendment, it should be pointed out that petitioner's arguments relating to failure to request transcription of closing arguments and improper sentencing review were already before the Court. Petitioner's additional claims with respect to grand jury selection and change of venue are indeed points which were not raised at the state level, as petitioner's counsel has explicitly recognized. Memorandum of October 24, 1980, at p. 2, n.2. Counsel has also indicated that she does not propose to pursue these claims at present because of this failure to exhaust state remedies. *Id.* In view of this position and the fact that no substantial supporting basis for these allegations of error has been suggested in any event, the Court will grant respondent's motion to strike.

In sum, the Court concludes that no basis exists for substantial amendment of the present petition. This case has been pending for over two years. Counsel well-acquainted with all relevant facts narrowed the issues after a state evidentiary hearing which he in no way called into question. Not only has oral argument been held, but counsel has suggested a theory upon which this Court now grants substantial relief. In these circumstances, the Court concludes that to permit additional amendment would only promote delay and confusion. This Court finds further that no proper basis exists for considering petitioner's *pro se* amendment insofar as it states unexhausted claims, since counsel has effectively withdrawn these allegations in any event. Accordingly, this amendment shall be reviewed only to the extent that it restates points already presented and argued in this litigation. The Court will therefore consider the following matters: (1) whether

the unavailability of closing arguments prevented constitutionally sufficient review of petitioner's sentence; (2) whether petitioner's guilty plea was in fact not made "knowingly and intelligently"; (3) whether petitioner was unaware of his right to withdraw his plea, all these errors being the result of ineffective assistance of counsel, and; (4) whether an adequate proportionality review was conducted by the Georgia Supreme Court.

## Analysis

### (1)

Petitioner attacks his conviction upon two grounds. It is alleged first that this plea was not intelligently and knowingly made. *Henderson v. Morgan*, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1975). Petitioner points out that, at the time of the sentencing hearing, in his description of the circumstances of the crime, Mr. Moore stated that he "didn't have no intention of killing him (Stapleton)." The indictment charged that Mr. Moore "unlawfully and with malice aforethought kill one Fredger Stapleton...." This language is derived from Ga.Code Ann. § 26–1101(a), which defines the crime of malice murder.[2] That code section provides in full as follows:

A person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

**2.** Some confusion appears to have developed at least in Mr. Bonner's mind as to whether petitioner was sentenced for malice murder or felony murder. This confusion is to be attributed in part to the fact that Mr. Moore was never sentenced for armed robbery, even though he was indicted for this offense and plead guilty to it. Such a situation would be typical of a felony murder, where the underlying offense merges with the homicide under Georgia law. *Woods v. State*, 233 Ga. 495, 212 S.E.2d 322

(1975). This Court will attempt no explanation of the trial court's failure to sentence for armed robbery. But, it is clear from the indictment that malice murder was the charge entered against the petitioner. It is also clear that the distinction here is largely technical, since, as Mr. Bonner stated before Magistrate Ford, "I don't believe there's any question that, if not malice murder, that the facts amount to felony murder."

Thus, petitioner contends that he was denied effective assistance of counsel in that he was not informed that the crime of malice murder required an intention to kill the victim. Petitioner contends further that he did not intend to kill Mr. Stapleton and, far from admitting this, he specifically denied such intent. Accordingly, he did not admit, or at least did not knowingly and intelligently admit, all the elements of the crime.

▮ Respondent disputes this argument based upon transcripts of the guilt and sentencing phases of trial as well as testimony received from petitioner and Mr. Pierce at the state habeas proceeding.[3] Respondent points out in particular that at the June 4, 1974 hearing when the guilty plea was received, it was established by direct inquiry of the trial court that petitioner had been apprised of the possible sentences to which his plea exposed him. At this hearing, petitioner also directly acknowledged that he had authorized Mr. Pierce to enter a plea of guilty and that he was in fact guilty as charged. Petitioner indicated that he was able to hear and understand the Court's inquiries, that he was not under the influence of any drug or narcotic and that his plea was not the product of threats, coercion, or promises of benefit. He stated that he understood his right to jury trial and his waiver of his right. Petitioner indicated that he had no witnesses to call in his behalf. He also indicated that he had conferred in detail with his attorney concerning the charges against him and the questions posed to him by the Court, and that he fully understood all matters. On the basis of these and other assurances, petitioner's plea of guilty was accepted, with sentencing postponed until the July hearing. *See Jones v. Wainwright*, 604 F.2d 414 (5th Cir. 1979); *Brown v. Jernigan*, 622 F.2d 914 (5th Cir. 1980).

In short, while it is true that the particular elements of the crimes charged were not individually addressed by the Court and the

defendant, there appears to be no basis in the June record for concluding that petitioner was unaware of the nature of the crimes charged or equivocal in his acknowledgment of guilt as to those charges. Furthermore, no basis for such doubts can be found in the detailed testimony which was received from Mr. Pierce at the state habeas corpus hearing. At that proceeding, Mr. Pierce indicated that he was "still on Billy's side in this thing and I'm not trying to hurt him in any way." State Habeas Hearing, at 39. Nonetheless, he was unwilling to support petitioner's contention. Quite the opposite, Mr. Pierce stated as follows:

> Well, of course, I explained the elements of the crime to him, and I explained what would be necessary for the death penalty to be, to be imposed insofar as aggravating circumstances were concurred. I told him he had a right to a trial by jury. *Id.*, at 46.

> I explained to him everything I could think to explain to him, what his rights were, what the procedure would be or could be, and I can't think of anything I did not tell him, now.

> *Id.*, at 48. *See also Id.*, at 52.

Mr. Moore disputed this characterization of the extent of the advise and information he was afforded. State Habeas Hearing, at 16–17. But, nonetheless, it appears from both his answers to questions posed in open court and testimony from his attorney that he did in fact well know the nature of the charges against him. This conclusion is also supported by consideration of petitioner's background. He was a high school graduate with experience in law enforcement as a military policeman. He had also been selected for specialized training while in the military. Thus, there is no reason to believe that he was unable to comprehend either the importance or the meaning of the charges against him.

Furthermore, it appears that even if petitioner did not specifically state that he intended to kill Stapleton, there is sufficient

---

**3.** Evidence obtained at a post-conviction proceeding may serve to supplement the trial transcript in determining whether a plea was volun-

tarily made. *Fisher v. Wainwright*, 584 F.2d 691, 693 (5th Cir. 1978).

factual basis in the undisputed record to support, if not demand, such a conclusion. Mr. Moore stated that he had participated in the first entry of Stapleton's home as part of a plan which included murder. Petitioner's later return to the house can readily be seen as carrying forward this intent at least to the extent of exhibiting an "abandoned and malignant heart." Similarly, the fact that petitioner carried a deadly weapon for the specific, acknowledged purpose of meeting "opposition" can support an inference of malice. *See, e. g., Young v. The State*, 243 Ga. 546, 255 S.E.2d 20 (1979); *Chandle v. The State*, 230 Ga. 574, 198 S.E.2d 289 (1973).

 In short, there is basis in the testimony of the petitioner at trial and Mr. Pierce thereafter as well as examination of the petitioner's background for concluding that he well understood the nature of the charges against him. There is also ample factual basis in the record to support a conclusion that the petitioner was in fact guilty of malice murder as defined under Georgia law.[4] In fact, the only point upon which any doubt at all may be founded is petitioner's statement at the time of sentencing concerning lack of "intent." However, upon reflection, even this slender evidence largely disappears. Considering the context in which it was offered—petitioner's obvious and understandable efforts to invoke the mercy of the Court—it seems clear that it was intended not as an unknowing repudiation of an element of the crime but a characterization of the *degree* of petitioner's culpability. Close examination demonstrates that petitioner did not say that he *never* intended to kill Stapleton, only that he had formed no such intent when he "left and went back over there."

Under Georgia law, premeditation is not a specific element of malice murder. *Burnett v. State*, 240 Ga. 681, 242 S.E.2d 79 (1978). In fact, malice need not be formed until immediately prior to the slaying. *Dixon v. The State*, 243 Ga. 46, 252 S.E.2d 431 (1979). Far from denying malice immediately prior to firing his gun, petitioner's statement confirms that fired in direct, purposeful response to Stapleton's actions. Moreover, the mere fact that he fired not once but four or five times is sufficient to support an inference of malice. *Young v. The State*, 243 Ga. 546, 255 S.E.2d 20 (1979).

I do not question that some inquiry by the trial court into the meaning of petitioner's "denial" of intent would have been wise and useful in avoiding the extended discussion his statement has provoked in this case and the state habeas proceeding. See *Boykin v. Alabama*, 395 U.S. 238, 244, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1968). However, after examination of the factual record and the legal conclusions developed by the state habeas court, it is clear that petitioner has failed to overcome the presumption of corrections which normally attaches to state habeas proceedings. 28 U.S.C. § 2254(d). Even in the absence of this presumption, an independent examination of the record permits no other view.

Petitioner's remaining argument with respect to entry of his plea of guilty may be dealt with more summarily. Much as with the issue of intent, Mr. Moore contends that he was never made aware of his right under Georgia law to withdraw his plea at any time before filing of the sentence imposed by the trial court. Thus, petitioner argues that, had he been informed of this right, he would in fact have withdrawn his plea because he did not intend to kill Stapleton and

---

4. With *specific reference to this matter*, Mr. Pierce testified as follows:

> Q. (Mr. Bonner): Uh, do you recall telling him that his lack of a specific intent to kill Mr. Stapleton was, would not amount to any kind of defense?
> A. Well, I didn't think it would under what we had. Here's a man who's broken into somebody's home with a, a .38 caliber gun.
> State Habeas, at 52.

Mr. Pierce's comment was with specific reference to the fact that felony murder was obviously an available charge even without intent, a point not disputed by Mr. Bonner. *See* note 2, *supra*. However, it makes clear that, by not raising the issue of intent, Mr. Pierce declined only a technical advantage. Of course, in so doing, he preserved petitioner's status as a cooperative, remorseful defendant. This Court can hardly find constitutional error in such a strategy.

he certainly did not wish to accept a sentence of death.

 Examination of the evidence on this question provides even less support for petitioner than in the case of his prior argument. The transcript of the June 4, 1974 hearing clearly shows that Mr. Moore was informed of his right to withdraw his plea at that time and receive a jury trial. Transcript, at 3. Again, there is no reason whatever to believe that petitioner was unable to understand the court's statement and to utilize the opportunity thus presented if he had so desired. Moreover, Mr. Pierce testified that he advised Mr. Moore fully on his right to withdraw his plea. State Habeas Hearing, at 48–49. Mr. Pierce also indicated that the trial court specifically confirmed that this advice had been offered by inquiry during a recess of the sentencing hearing. *Id.* Counsel further explained that the petitioner had specifically decided, upon his recommendation, not to withdraw the plea even if a death sentence were imposed:

> I felt that we were better to go ahead with the appeal on the one man imposing the sentence. This case had a lot of mitigating circumstances in it and I thought that they would be considered on, on the appeal.

*Id.*, at 52. See also *Id.*, at 39.

Aside from petitioner's own testimony, there is simply no basis for concluding that he was unaware of his right to withdraw his plea. Far from representing ineffective assistance, the decision to proceed with appeal of the sentence of the trial court appears to be the reasoned conclusion of counsel facing a situation with no obvious or easy solution.[5] The Court finds no basis for concluding that this strategy was beyond the range of competent legal practice. Nor does the Court find any basis for concluding that this decision was made without the informed consent of the petitioner. The Court therefore sees no ground for relief in this contention.

(2)

Petitioner's two remaining arguments relate only to his sentence and particularly to the proportionality review accorded it by the Georgia Supreme Court. Petitioner contends first that, because closing arguments at sentencing were not transcribed, the Georgia Supreme Court lacks an adequate record by which to consider the propriety of the death penalty. This argument is considered at length in *Stephens v. Zant,* 631 F.2d 397 (5th Cir. 1980). *Stephens* makes clear that, even in a capital case, the absence of transcribed closing arguments need not produce error of constitutional dimensions. Instead, the Court concludes that constitutional mandates are satisfied when the appellate court has a record sufficient to avoid "substantial risk" that the penalty would be inflicted in an arbitrary and capricious manner.

 Under the statutory mandates approved in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1975), the Georgia Supreme Court is specifically required

> to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases.

428 U.S., at 198, 96 S.Ct., at 2936. Thus, the question becomes whether the lack of transcribed closing arguments created "substantial risk" that these functions could not be discharged. Several factors convince the Court that no such risk was occasioned. Most important perhaps, this case does not involve a jury which might have been swayed by emotional appeals. Sentence was pronounced by the court, which can reasonably be expected to discount improper argument. Second, there is no suggestion made here that anything unusual or

---

5. Of course, for reasons which will be more fully developed shortly, this Court finds that Mr. Pierce's strategy ultimately affords the petitioner relief which would be at best far more

difficult to sustain in the face of a jury verdict which carried no real explanation of the process by which sentence was arrived at.

improper occurred during these arguments. The Court's effusive praise of the defendant as one who "did everything that a man could do after you were caught and do an honorable thing", July 17, Hearing, at 54, hardly suggests that any improper attack on the petitioner had entered the Court's thinking. Third, the Georgia Supreme Court had the benefit of detailed reports on the defendant and the crime, as well as the trial court's own summary of the case available for consideration. Finally, the trial court, in passing sentence, placed on the record a statement detailing the facts of the case as well as other points which had guided the decision to impose the death penalty.

The presence of these many factors convinces this Court that the record as a whole adequately meets "the need for reliability in the determination that death is the appropriate punishment in [this] specific case," *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (Stewart, Powell, Stevens, JJ.), and that the capital sentencing procedures have been administered with an even hand. See *Gardner v. Florida*, 430 U.S. 349, 361, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1976). It remains however to be determined whether in fact the Georgia Supreme Court's examination of petitioner's case meets the constitutional requirement that the death penalty not be applied arbitrarily and freakishly. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1971).

Before considering the question of whether petitioner's sentence was adequately reviewed, it will be useful to describe in some detail the reasoning through which it was apparently arrived at. Judge McMillan began his discussion of sentence by specific reference to the formal requirements of Georgia law. He found in particular that petitioner had committed a capital offense, malice murder, while in the commission of another capital crime, armed robbery. This finding was, of course, sufficient to support capital punishment under the Georgia requirement that at least one aggravating factor be present. Ga.Code Ann. § 27–2534.1(b).

However, Judge McMillan did not stop here. After this determination and imposition of the death penalty ostensibly based up it, the court made several comments which do much to illuminate the logic of its decision. Judge McMillan first described his impression of petitioner's conduct with respect to the crime:

> You, in my opinion, did everything that a man could do after you were caught and do an honorable thing insofar as your true statements made, your cooperation with the officials, pleading guilty to the mercy of the Court, and placing an awesome responsibility on me.

July 17 Hearing, at 54–55.

Judge McMillan then went on to discuss his role in the sentencing process. In particular, the judge indicated that he viewed the problem of insuring that petitioner's sentence was proper as exclusively the task of the Georgia Supreme Court:

> [T]hey will take cases that have taken place in Georgia over a period of years and they will apply the facts to the case to the facts of other cases that have happened in Georgia, and then they will apply "evenhanded justice" to your case with other similar cases that have happened in Georgia. As to whether or not that actually applies in your case is for them to decide.

*Id.*, at 55–56.

After this discussion and a further reference to mitigating circumstances which he found insufficient to "wipe out the aggravating statutory circumstances," Judge McMillan stated the specific basis of his conclusion:

> If we're going to philosophy about it, and if I'm permitted to do that, I'll do it. People in their homes—the most precious place a man can have—is his home; and to be in a home, and probably this man was asleep, I don't know, or for any person to be, not this man, but any person, to be asleep in his home, to be invaded by an intruder, that's armed with weapons, that's necessarily to kill (or otherwise the weapon wouldn't be there in the hands of

the intruder), is probably an invasion of the highest injustice that another can do. Now I can only imagine that anyone that is invaded by an intruder with an armed weapon, the fear that they must go through when they encountered in such a situation. So, I feel like that if the Court ever does require mandatory punishment—that is when they specify by law what offenses will have to be suffered by the electric chair—that one of these statutory offenses probably will be that when a person is robbed and killed in his home, that mandatory, as contrasted to discretionary, statutory aggravated circumstances will probably warrant the electric chair without life imprisonment. That justifies me in making the finding that I made.

July 17, at 56–57.

In summary, Judge McMillan nominally based his sentence upon a finding of one aggravating factor, as provided for under Georgia law. Ga.Code Ann. § 27–2534(b)(2). However, the court's remarks went considerably farther in specifying the logic behind this authorized but nonetheless highly discretionary judgment.[6] Judge McMillan specifically stated that the petitioner's conduct subsequent to his capture had been "everything that a man could do." Judge McMillan's comments are also notable for their silence on the subject of conduct prior to the murder which suggested that the petitioner was in some way more dangerous or reprehensible than the specific circumstances of the crime itself indicated. In short, Judge McMillan gave no indication whatever that there was anything special in the "character and propensities of the offender," *Gregg, supra,* 428 U.S., at 189, 96 S.Ct., at 2932, which would permit identify-

ing him as one of "the few cases in which it (death) is imposed." *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (White, J.).

It is apparent from Judge McMillan's remarks that the determining factor in his decision, the one fact that could not be "wiped out" was that Stapleton was "asleep in his home." Thus, in Judge McMillan's view, petitioner's crime was "the highest injustice that a man can do." Defendant's crime was in fact so heinous that the court believed it would support *mandatory* execution without consideration of mitigating factors: "That justifies me in the finding that I made."[7]

Judge McMillan's analysis does not merely specify the determining factor in the imposition of the death penalty. It also describes the court's notion of its role in the sentencing process. Judge McMillan indicates directly that his focus was entirely limited to the case at hand and his personal "philosophy" with respect to the facts of the crime. The court indicates directly that there has been no attempt whatever at "even handed justice." The court has only applied its own personal view of the overwhelming severity of the offense, while, of course, observing the necessity that statutory authorization for these preferences be invoked. Thus, Judge McMillan left it entirely up to the Supreme Court of Georgia to determine whether his personal view of the severity of the crime was the general view of judges and juries considering similar cases or merely "the whim of one man." *Furman, supra,* at 253, 92 S.Ct., at 2733 (Douglas, J.).

As I have already indicated, Georgia law imposes three requirements on the State

---

6. This Court has conducted a rough analysis of murder cases reported in the most recent complete volume of the Georgia Supreme Court Reporter (246 Ga. (1980)). Wide variations in the factual detail reported makes firm statistics impossible, but it appears that of the approximately forty cases, which were subjected to initial review, at least fourteen appeared to involve statutory aggravating circumstances. The death penalty had in fact been authorized in only six.

7. Of course, intervening decisions make clear that mandatory sentencing on this basis without reference to the character of the defendant is not constitutionally permissible. *See, e. g., Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1975). Therefore, to the extent that Judge McMillan may be seen as following a mandatory policy, petitioner's sentence would appear to be unconstitutional *ipso facto.*

Supreme Court in the sentencing review process. The court is required to determine: (1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Ga. Code Ann. § 27–2537(c)(1–3). In the present case, there is no doubt that the trial court's finding of statutory aggravating circumstance was supported by the evidence. This Court's central concern is then the question of proportionality, i. e., whether "similar cases" have indeed produced similar punishment. Under the present facts at least, this test overlaps substantially with the companion requirement that "arbitrary factors" be isolated. In this case, the sentencing authority has directly stated that the controlling factor in his decision was the fact that the victim was accosted in his home. By examining sentencing patterns in this situation, one may determine whether indeed Judge McMillan's view of the gravity of petitioner's crime was an "arbitrary and capricious" analysis which produced a disproportionate sentence.

Thus, it is possible to outline the task of the Georgia Supreme Court in evaluating petitioner's sentence quite specifically. It is not so easy to describe the role of the federal court in reviewing this determination. The parties agreed during oral argument that the federal court's function was set out by the decision of the Fifth Circuit in *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir. 1978). In *Spinkellink*, the court rejected petitioner's demand that an essentially *de novo* proportionality review be carried out in the habeas proceeding. Instead, the court held that where there is no reason to believe that sentencing review has not followed statutory mandates, the federal tribunal generally should not inquire into whether the state court had reached an arbitrary result in a particular case.

If a state has such a properly drawn statute—and there can be no doubt that

Florida has—which the state follows in determining which convicted defendants receive the death penalty and which receive life imprisonment, then the arbitrariness and capriciousness condemned in *Furman* has been conclusively removed.

578 F.2d, at 605 (footnote omitted).

Thus, it appears that the federal role typically should be limited to review of whether the formal requisites of a capital statute have been observed, without reference to the results actually arrived at. This view is, of course, a reflection of the court's extreme reluctance "continuously to question every substantive decision of the Florida criminal justice system with regard to the imposition of the death penalty." 578 F.2d, at 604. However, the court does not stop here. Despite the general prohibition on case-by-case review,

[t]his is not to say that the federal judiciary should never concern itself on habeas corpus review with whether section 921.-141 is being applied arbitrarily and capriciously. If a petitioner who has been sentenced to death can show that the facts and circumstances of his case are so clearly undeserving of capital punishment that to impose it would be patently unjust and would shock the conscience . . . then federal court intervention, might be warranted.

578 F.2d, at 606, n.28.

Thus, *Spinkellink* suggests in essence a two-step analysis. The federal tribunal is mandated first to consider whether the state courts have in fact followed the requirements of a constitutionally drawn statute, such as Georgia, of course, has. *Gregg, supra*. If it appears that the state has followed this statute, then scrutiny is limited to cases where the result reached is so extreme as to "shock the conscience." By implication at least, *Spinkellink* also suggests that where it appears that the state tribunal has *not* met its responsibilities adequately, the federal role does indeed increase substantially, perhaps rising even to the *de novo* review sought by the petitioner there.

This interpretation of the federal role with respect to appellate proportionality review seems generally in accord with the intervening United States Supreme Court decision in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1979). In *Godfrey*, the Supreme Court considered Georgia appellate processes with respect to capital sentences imposed on the basis that the crime was "outrageously or wantonly vile, horrible, or inhuman in that it involves torture, depravity of mind, or an aggravated battery to the victim." Ga.Code Ann. § 27–2534.1(b)(7). The exact nature of this examination is not easily described. It appears that *Godfrey* can be characterized as a finding that "a majority of this court disagrees" with the conclusion of the Georgia Supreme Court that "facts supported the jury's finding of the existence of statutory aggravating circumstance § b(7)." 446 U.S., at 449, 100 S.Ct., at 1776 (White, J. dissenting). On the other hand, the court's conclusion may be seen as resting on the failure of the Georgia court to define b(7) with sufficient clarity:

[T]he question is whether the court below has adopted so ambiguous a construction of the relevant provision that the universe of cases that it comprehends is impermissibly large, thus leaving undue discretion to the decisionmaker and creating intolerable dangers of arbitrariness and caprice.

446 U.S., at 435, n.1, 100 S.Ct., at 1768, n.1 (Marshall, J., concurring).

However, this Court finds it unnecessary to choose between these characterizations. Instead, it appears that both are essentially correct. The Court in its initial analysis does indeed consider whether b(7) is impermissibly vague. Thus, the Court finds that the statutory language "standing alone" provides no

inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman' ... The standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury in this case was in no way cured by the affirmance of those sentences by the Georgia Supreme Court.

446 U.S., at 428–29, 100 S.Ct., at 1765.

Having determined first that the Georgia Supreme Court's review process did not adequately discharge the statutory and constitutional duty to construe b(7) so as to channel jury discretion, the Court moves to a more substantive inquiry:

Thus, the validity of the petitioner's death penalty turns on whether, in light of the facts and circumstances of the murders that Godfrey was convicted of committing, the Georgia Supreme Court can be said to have applied a constitutional construction of the phrase "outrageously or wantonly vile, horrible or inhuman in that [they] involved ... depravity of mind. . . ."

446 U.S., at 432, 100 S.Ct., at 1767 (footnote omitted).

The Court quickly determines that "petitioner's crimes cannot be said to have reflected consciousness materially more 'depraved' than that of any person guilty of murder." 446 U.S., at 432–33, 100 S.Ct., at 1767. The petitioner's case is thus held to be indistinguishable from the many cases in which the death penalty was not imposed. Accordingly, his death sentence is reversed.

To be sure, this analysis has been subjected to serious criticism along much the lines suggested in *Spinkellink*. Thus, Justice White describes the court as assuming "the role of a finely tuned calibrator of depravity, demarcating for a watching world the various gradations of dementia that lead men and women to kill their neighbors." 446 U.S., at 456, n.6, 100 S.Ct., at 1779, n.6 (White J., dissenting). However, it appears from *Godfrey* as well as *Spinkellink* that the role of the federal tribunal does indeed involve the two-fold task of assessing first whether the state court has properly discharged its statutory and, hence, constitutional duty. Where that task has not been fulfilled, the federal court has the second responsibility to weigh the facts at hand to

determine whether the death penalty may be applied under any constitutional application of the statute in question. Finally, under *Spinkellink*, the federal court has the further duty to determine whether a death sentence imposed under apparently proper procedures is nonetheless so extreme and disproportionate as to "shock the conscience."

In the present case, the statutory duty of the Georgia Supreme Court has already been delineated. The Georgia court, in pertinent part, is mandated to determine whether petitioner's sentence is appropriate to his crime by considering "the penalty imposed in similar cases, considering both the crime and the defendant." Ga.Code Ann. § 27–2537(c)(3). However, determining what constitutes an appropriate sample of "similar cases" need not be any simple task. To a degree perhaps unequaled in any other area of law, capital cases appear to implicate the perspectives and attitudes of the individual reflecting upon them.

Thus, even in the basic statement of a case, enormous differences may appear in the way observers characterize relevant facts and circumstances. These differences can surely have much significance for, how and against what other "similar cases" a particular crime and criminal are considered.[8]

However, in the present case, it is unnecessary to speculate on what factors are to be considered in sentencing review. Because Judge McMillan specifically outlined the basis of his judgment, the Georgia Supreme Court was provided with a clear basis for determining what cases could be considered "similar" for purposes of their comparison.

The fact that petitioner was sentenced to death despite affirmative indication that his conduct after the crime had been exemplary as well as at least the implied conclusion that his background was also a factor in mitigation, clearly demanded that the Geor-

---

**8.** Thus, in *Godfrey*, the plurality characterizes "the crime and the criminal" as follows:

> The victims were killed instantaneously. They were members of his family who were causing him extreme emotional trauma. Shortly after the killings he acknowledged his responsibility and the heinous nature of his crimes.

In dissent, Justice White develops the same facts in part as follows:

> [p]etitioner, in a coldblooded executioner's style, murdered his wife and his mother-in-law and, in passing, struck his young daughter on the head with the barrel of his gun . . . Petitioner's wife lay prone on the floor. Mrs. Godfrey's head had a hole described as 'approximately the size of a silver dollar' on the side where the shot entered, and much less decipherable and more extensive damage on the side where the shot exited. Tr. 259. Pellets that had passed through Mrs. Godfrey's head were found embedded in the kitchen cabinet.

446 U.S., at 449, 100 S.Ct., at 1775.

Of course, both of these views are entirely in accord with the facts presented. Yet, they clearly show very substantial differences of definition which must be reflected ultimately in the process and outcome of review. Thus, for example, the plurality quickly dismisses the fact that the victims here were horribly mutilated by the shotgun blasts which killed them. The opinion states only that, since they were killed instantly,

> it is constitutionally irrelevant that the petitioner used a shotgun instead of a rifle as the

murder weapon, resulting in a gruesome spectacle in his mother-in-law's trailer. An interpretation of § (b)(7) so as to include all murders resulting in gruesome scenes would be totally irrational.

446 U.S., at 433, n.16, 100 S.Ct., at 1767, n.16. However, Justice White, in dissent, finds these facts at least highly suggestive of petitioner's "depravity of mind." The plurality Justice White concludes, "ignores the obvious correlation between gruesomeness and "depravity of mind," between gruesomeness and "aggravated battery," between gruesomeness and "horrible," between gruesomeness and "vile," between gruesomeness and "inhuman." Even if these relationships are not in fact "obvious" as Justice White suggests, it is obvious that they highlight conflicts in the personal perspectives of observers which have little or no 'legal' component. Certainly they reflect differences which cannot be resolved by any process of legal analysis, yet they go far toward determining legal results. Of course, such differing views of factual matters are hardly unusual in the law. Indeed, the jury system itself is obviously in no small part an effort to temper and control such widely and commonly varying perspectives. What is highly novel is the Supreme Court's requirement that these widely varying perspectives and equally variable characterizations of crimes and criminals nonetheless ultimately produce some rational, discoverable sentencing pattern.

gia Supreme Court closely test Judge McMillan's view that intrusion into a private home was *ipso facto* sufficient to demand capital punishment when the resident was killed. Moreover, because Judge McMillan clearly defined his duty as limited to expressing a personal view of the crime without reference to questions of "even-handed justice," the Georgia Supreme Court bore a special burden. It was particularly incumbent upon that court to insure that Judge McMillan's view was not the arbitrary judgment of one individual. It was particularly important for the Georgia court in fact to examine other cases where homes were burglarized and the residents killed to determine whether such conduct had in fact brought the death penalty with some discernable regularity even in the presence of mitigating circumstances.

Examination of the cases cited by the Georgia Supreme Court in its sentencing review clearly demonstrates that it did not in fact consider "similar cases." In the Appendix to its ruling, the Georgia court lists twenty-three cases which were considered on the basis of "similarity" to the petitioner's crime. In fact, it appears that only three of these cases involved victims who were attacked in their homes. *Creamer v. State*, 232 Ga. 136, 137, 205 S.E.2d 240 (1974); *Pass v. State*, 227 Ga. 730, 182 S.E.2d 779 (1971); *Allen v. State*, 231 Ga. 17, 200 S.E.2d 106 (1973). Furthermore, only one involved imposition of the death penalty, which is hardly suggestive of any particular sentencing pattern.

Examination of even the most basic facts of these cases reveals little, if any similarity to petitioner's crime. *Creamer* involved the torture and murder of two doctors who were also husband and wife. The defendant along with two others waited outside the home of the two victims. When the first emerged from the door to go to his car, he was attacked and shot by Creamer. He was then beaten about the head, carried out into the driveway and shot again. The second victim attempted to come to his aid. She fired at the attackers, but she was eventually seized by them, shot through each arm, taunted, and finally killed with a

gunshot from another of the assailants as she lay face down on her own patio. Despite four prior felony convictions and his being over forty years old, this defendant received only a life term for his crimes.

*Allen* involved a crime spree during which the defendant had first stolen a car and then obtained two pistols in separate burglaries committed while he drove north from Atlanta toward Greenville, S.C. While still on this route, the defendant broke into a third home. This time the residents, an elderly couple, were present. They were awakened by Allen when he fired a shot to blow off the lock on the rear door. Defendant shot and killed both when they came to investigate. He then ransacked their home before continuing on his way. After at least one other crime, the theft of a second car, he was apprehended and confessed. Despite being forty-two years old and having a lengthy history of prior offenses, including several felonies, Allen was sentenced to life imprisonment.

*Pass* is the only case where a death sentence was in fact imposed. There the defendant broke into a home and ransacked it, stealing a variety of items. The defendant was surprised by the residents in the midst of his crime. Both the victims, husband and wife, were found shot through the head. The husband's head was lacerated, apparently as a result of having been beaten with a baseball bat which was found nearby. There was no evidence of prior convictions, but defendant repudiated his confession and offered an alibi defense at trial. The only evidence of mitigating circumstances was a defense claim that the defendant was mentally retarded.

Distasteful as this exhibition of horrors certainly is, it nonetheless establishes beyond serious doubt that the virtual *per se* rule which Judge McMillan declared as his rationale in the present case has not been followed in Georgia with respect to crimes which were in many significant ways vastly more reprehensible than petitioner's. This Court would attempt no logical distinction between the results reached in *Creamer,*

*Allen* and *Pass,* if in fact any real differences can be noted at all. But, it appears entirely obvious that all three are far different from the present case with respect to both crimes and defendant. In no way do they support the result reached by Judge McMillan. Quite the opposite, they compel the conclusion that petitioner's sentence is not appropriate.

██ Thus, this Court concludes that, in reviewing petitioner's sentence, the Georgia Supreme Court did not confine itself to "similar cases" as required by statute. Twenty of the twenty-three cases which were considered did not resemble the present facts sufficiently to provide any useful comparison to the sentence imposed here. Of the remaining three, only one resulted in a death sentence despite the fact that all were substantially more reprehensible than the present case when considered from the point of view of both the crime and the defendant. These three cases clearly suggest that Judge McMillan's "philosophy" with respect to the sanctity of the home is not reflected in Georgia sentencing policy generally. It appears to be merely an arbitrary factor which cannot effectively "distinguish this case in which the death penalty was imposed, from the many cases in which it was not." *Godfrey, supra,* 446 U.S., at 433, 100 S.Ct., at 1767.

An extensive search for other cases which might support the determination of the Georgia Supreme Court lends further support to the conclusion suggested by *Pass, Creamer* and *Allen.* Thus, in *Hill v. State,* 237 Ga. 794, 795, 229 S.E.2d 737 (1977), the death penalty was imposed and affirmed with respect to the robbery of a home and murder of the person who resided there. However, this sentence was based, not on robbery, but on a finding that the crime was "outrageously vile...." This finding was supported by evidence

> that the victim was held down on his couch, viciously beaten and stabbed while his home was being looted and subsequently had his throat cut in another room of his home where he had sought refuge.

237 Ga., at 802, 229 S.E.2d 737. There is no indication whatever in this opinion that the mere fact that a home was the situs of the crime was or could have been viewed as sufficient to support the death penalty. Certainly, there is no similarity whatever in the circumstances of this brutal torture murder and the crime committed by petitioner here. Yet, the Georgia court cited not only *Pass* but *Moore* in its listing of "similar cases."

In *Berryhill v. State,* 235 Ga. 549, 221 S.E.2d 185 (1975), a death sentence was upheld, but only where the defendant had "a long history of psychological problems and a lengthy prior criminal record." 235 Ga., at 549, 221 S.E.2d 185. Moreover, his crime involved a calculated, sadistic attack on the victim in his home:

> As Hooks fled up the stairs, defendant shot him twice in the legs; then, followed him upstairs and shot him a third time through a closed bedroom door. Defendant shot Hooks twice more; the fifth shot was through the head while Hooks lay on the floor of his daughter's bedroom.

*Id.* Again there is obviously no real similarity between this case and petitioner's. Moreover, there is no basis in the case for concluding that the site of the crime and not the extraordinary cruelty it certainly reflected was controlling. In fact, any thought that location alone was determinative seems entirely untenable in view of the fact that Berryhill's companion, who was not the "triggerman," received only a life sentence. *Lane v. The State,* 238 Ga. 407, 233 S.E.2d 375 (1977).

Other cases might be cited where murders committed in the course of burglary of a home produced the death penalty, but only under circumstances far more extreme than are present here. *See, e. g., Coleman v. The State,* 237 Ga. 84, 85, 226 S.E.2d 911 (1976) (the Alday murders). The Court is aware also of one case where less severe circumstances produced only a life sentence. See *Johnson v. The State,* 232 Ga. 61, 205 S.E.2d 190 (1974). But, in no wise, has this Court been able to locate a single "residential murder" involving substantial mitigat-

ing circumstances and no aggravating factors in the manner of the crime, where the defendant received a death sentence. Quite the opposite, even before Judge McMillan, in Jefferson County at the approximate time of petitioner's crime, juries did not uniformly impose death for murders which were obviously far more horrible than Mr. Stapleton's. Thus, in *Birt v. State*, 236 Ga. 815, 225 S.E.2d 248 (1976), death was imposed for the brutal torture murder of an elderly couple in their home. Another jury likewise returned a death sentence for a second participant in the crime. *Gaddis v. The State*, 239 Ga. 238, 236 S.E.2d 594 (1977). Nonetheless, the third participant was given only a life term despite the fact that "[t]he same witnesses testified in this case for the state as testified in Birt's trial. The evidence was the same...." *Reed v. The State*, 238 Ga. 457, 233 S.E.2d 369 (1977).

Consideration of one additional Georgia case reinforces this Court's conclusion and, in fact, compels the view that, even under a "shock the conscience" test, petitioner's death sentence cannot stand. *Furman* is, of course, the case which established the constitutional requirement that juries be guided in their decisions with respect to capital punishment. *Cf. McGautha v. California*, 402 U.S. 183, 198, 91 S.Ct. 1454, 1462, 28 L.Ed.2d 711 (1970). The facts in *Furman* were set out as follows:

> The victim surprised Furman in the act of burglarizing the victim's home in the middle of the night. While escaping, Furman killed the victim with one pistol shot fired through the closed kitchen door from the outside. At the trial, Furman gave his version of the killing:
>
> "They got me charged with murder and I admit, I admit going to these folks' home and they did caught me in there and I was coming back out, backing up and there was a wire down there on the floor. I was coming out backwards and fell back and I didn't intend to kill nobody. I didn't know they was behind the door. The gun went off and I didn't know nothing about no murder until they arrested me, and when the gun went off I

was down on the floor and I got up and ran. That's all to it." App. 54–55.

The Georgia Supreme Court accepted that version:

> "The admission in open court by the accused ... that during the period in which he was involved in the commission of a criminal act at the home of the deceased, he accidentally tripped over a wire in leaving the premises causing the gun to go off, together with other facts and circumstances surrounding the death of the deceased by violent means, was sufficient to support the verdict of guilty of murder...."

*Furman v. State*, 225 Ga. 253, 254, 167 S.E.2d 628 (1969).

408 U.S., at 294, n.48, 92 S.Ct., at 2754, n.48. (Brennan, J. concurring). Considering these facts, and only very sketchy mitigating circumstances, Justice Brennan wrote that "[i]f, for example, petitioner Furman or his crime illustrate the 'extreme,' then nearly all murders and their murders are also 'extreme.'" 408 U.S., at 294, 92 S.Ct., at 2754 (footnote quoted above). *See also* 408 U.S., at 313, 92 S.Ct., at 2764 (Stewart, J., concurring).

Of course, in *Furman*, the court found that "imposition and carrying out of the death penalty in these cases constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 408 U.S., at 239–40, 92 S.Ct., at 2727 (*per curiam*). While the facts in *Pass, Allen* and *Creamer* bear little similarity to the present case, *Furman* obviously displays many striking parallels. Only Furman's claim of "accident" might distinguish his crime from the present facts, but such a distinction hardly goes far in light of the undisputed evidence that petitioner fired out of a mixture of fear and intoxication *after* his victim had first fired at him. Thus, it appears to this Court that the present facts are substantially indistinguishable from the very situation which lead the Supreme Court to find the death penalty as then applied unconstitutional. To be sure, the law under which Mr. Moore was convicted was constitutional on its face. *Gregg, su-*

*pra.* But, the result here reached, even if it were based upon proper statutory procedures, is no better. To permit petitioner to be executed in these circumstances would indeed "shock the conscience."

### Conclusion

For the reasons set out above, this Court concludes that petitioner's plea and sentencing were carried out in proper accord with constitutional mandates. However, the Court concludes also that constitutional mandates were not observed in appellate review of this sentencing. The Court further determines that petitioner's sentence of death cannot be sustained in light of any proper sentencing review and the holding of the United States Supreme Court in *Furman.* Petitioner's sentence is therefore vacated. He is hereby remanded to the Superior Court of Jefferson County for further proceedings not inconsistent with this opinion.

### APPENDIX

#### I

Debate over the proper statutory and procedural means for imposition of capital punishment long antedates even the discovery of America.[1] Echoing Exodus 21:12–13, the laws of Alfred provided:

> Let the man who slayeth another willfully perish by death. Let him who slayeth another of necessity or unwillingly, or unwillfully, as God may have sent him into his hands, and for whom he has not lain in wait be worthy of his life and of lawful but if he seeks an asylum.

Quoted in 3 J. Stephen, History of the Criminal Law of England 24 (1883). The statute of Gloucester, 6 Edw. 1, c.9 (1278), provided that in cases of self-defense or misadventure the jury should neither convict nor acquit, but should find the fact specially, so that the King might decide to offer a pardon, as he generally did in such situations. Indeed, the familiar if hardly simple concept of "malice aforethought"

emerged in the sixteenth century as yet another attempt to separate homicides which merited capital punishment from others which did not. 3 *Id.*, at 46–73.

This development did not cease in America. The early history of this country reflects a broad aversion to the common-law rule which imposed a mandatory death sentence on all convicted murderers. In 1794, Pennsylvania abolished capital punishment except for "murders of the first degree," which included all "willful, deliberate, and premeditated" killings, and for which death remained mandatory. Pa.Laws 1794, c.1777. Virginia and many other states adopted similar reforms thereafter. Nonetheless, they, like the notion of malice aforethought, proved inadequate. Notions of "degree" of fault soon became little more than "mystifying cloud(s) of words." B. Cardozo, What Medicine Can Do For Law, In Law And Literature 70, 100 (1931). Moreover, juries often simply refused to follow these statutes in situations where capital punishment was clearly required but it was nonetheless considered inappropriate for one or another reason. *See Andres v. United States*, 333 U.S. 740, 753, 68 S.Ct. 880, 886, 92 L.Ed. 1055 (1948) (Frankfurter, J., concurring).

This problem of jury nullification might have been met by increasingly specific statutory guidance. However, legislatures did not follow this course. Instead, the general response was to explicitly grant juries the discretion they already exercised in fact. *See* Knowlton, Problems of Jury Discretion in Capital Cases, 101 U.Pa.L.Rev. 1099, 1102 and n.18 (1953). In 1897, federal law was changed to reflect this view. Act of Jan. 15, 1897, c.29, § 1, 29 Stat. 487. Thus, in *Winston v. United States*, 172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456 (1899), the Supreme Court considered whether a federal jury should be required to find mitigating circumstances before it could return a recommendation of mercy. The court concluded that such a requirement would conflict with legislative intent that the sentencing deter-

---

1. The historical analysis developed below has been drawn largely from *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1970).

mination should be left exclusively to the jury:

> How far considerations of age, sex, ignorance, illness or intoxication, of human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act of Congress to the sound discretion of the jury, and of the jury alone. 172 U.S., at 313, 19 S.Ct., at 215. *See also, Andres, supra*, 333 U.S., at 743, 68 S.Ct., at 881.

Finally, in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the court offered a more general discussion of the role of the jury in death cases. The court observed that, in capital proceedings, juries "do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." *Id.*, at 519, 88 S.Ct., at 1775 (footnote omitted). The jury's main function and value was thus defined as "to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.' " *Id.*, at 519 n.15, 88 S.Ct., at 1775 n.15 (citation omitted).

## II

The problem of jury discretion in capital sentencing is then anything but new. Moreover, it is not a novel problem for the judiciary. Constitutional challenges to jury discretion date from at least the *Winston* decision in the late nineteenth century. However, recent decades have brought a new perspective to this ancient struggle between specifying law and jury discretion. Whereas law was once seen as a means to force reluctant juries to do their duty and impose capital sentences, more recently law

has emerged as a favored means to control juries which were considered too ready to impose death. Thus, in *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1970), the court considered whether the "untrammeled discretion" of the trier of fact was so "fundamentally lawless" as to deprive the accused of life without due process. Writing for the court, Justice Harlan first noted the many lower courts which had considered and uniformly rejected such arguments. 402 U.S. 196, n.8, 91 S.Ct. 1461, n.8. Noting further that "a strong showing [is required] to upset this settled practice of the nation on constitutional grounds," *Id.*, at 203, 91 S.Ct., at 1465, Justice Harlan went on to conclude that statutory control of jury discretion was neither constitutionally mandated nor practically possible:

> Those who have come to grips with the hard task of actually attempting to draft means of channeling capital sentencing discretion have confirmed the lesson taught by the history recounted above. To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty and to express those characteristics in language which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability.
>
> In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution.
>
> The infinite variety of cases and facets to each case would make general standards either meaningless 'boilerplate' or a statement of the obvious that no jury would need.
>
> *Id.*, at 204, 207, 208, 91 S.Ct., at 1465, 1467.

*McGautha* is, however, notable also as an exposition of the contrary view. Thus, Justice Brennan, in a dissent joined by Justices Marshall and Douglas, concluded that the Constitution did not permit

capital sentencing procedures that are purposely construed to allow maximum possible variation from one case to the next, and provide no mechanism to prevent that consciously maximized variation from reflecting merely random or arbitrary choice.

Id., at 248, 91 S.Ct., at 1487.

Describing existing procedures as the "unguided, unbridled, unreviewable exercise of naked power," Justice Brennan opined that state law was constitutionally required to provide guidelines sufficient to control the "arbitrary and capricious" exercise of sentencing power. Drawing on a variety of cases, several dealing with state administrative actions, Justice Brennan concluded that

State procedures are inadequate under the Due Process Clause unless they are designed to control arbitrary action and also to make meaningful the otherwise available mechanism of judicial review.

Id., at 268, 91 S.Ct., at 1498.

Of course, it is this latter view which prevailed only a year later in Furman, supra. In fact, the language such as that quoted above from McGautha has become a staple of the many more recent Supreme Court considerations of capital punishment. For example, in Godfrey, the plurality opinion notes that state statutes

must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process of imposing a sentence of death.' 446 U.S., at 428, 100 S.Ct., at 1764. See also Gregg, supra, 428 U.S., at 195, n.45, 96 S.Ct., at 2935, n.45 (Stewart, Powell, Stevens, JJ.).

Thus, for approximately the last decade, the Supreme Court has mandated a process of statutory development designed to achieve what McGautha found "beyond present ability." If the states are to have capital punishment at all, they must develop procedures which make it "regular and reviewable," so as to provide a "meaningful basis for distinguishing the few cases in which [the] penalty is imposed from the many in which it is not." Furman, supra, at 313, 92 S.Ct., at 2764.

### III

As was noted initially, the passage of now approximately a decade since Furman and the specific facts of Blake, Burger, and Moore seem to this Court to provide a useful occasion for considering whether recent Supreme Court decisions have led to state laws which do promote rational jury decisions and effective appellate review, instead of the "meaningless boilerplate" or bromides which Justice Harlan warned against. More particularly, they provide an important opportunity for considering the developing role of the judiciary, state and federal, in administering these new statutory attempts to meet the requirements suggested in McGautha and announced in Furman.

Furman and its progeny may be seen as mandating, in effect, three levels of constitutional protections for the accused in a capital case. There is, of course, in the first place, the broad "umbrella" of due process which is accorded any defendant in criminal proceedings. Thus, this Court considered in Blake whether the constitutional guarantee of the assistance of counsel was violated by a trial in which sanity was the major issue and yet little, if any, competent expert testimony was received. In this context, the Court was, of course, not limited to considering only capital cases. In fact, many of the decisions which were relied upon did not involve the death penalty. See, e. g., Bush v. McCollum, 344 F.2d 672 (5th Cir. 1965). The fact that a capital sentence was at issue might properly have figured in the Court's evaluation of questions such as whether error is to be considered harmless, but it obviously did not create the rights under discussion.

There is, of course, no disagreement as to the propriety of judicial supervision in such matters as these. Whatever one's evaluation of the constitutional requirements for capital punishment, no one doubts that the courts must "insure that the rights of a defendant are scrupulously respected," and, that in capital cases particularly, the courts "must see to it that the jury has rendered

its decision with meticulous care." *Godfrey, supra,* 446 U.S., at 443, 100 S.Ct., at 1772 (Burger, C. J., dissenting). Serious controversy develops only when one moves beyond the broad protections due criminal defendants generally to the far more specific and far less commonplace procedural and substantive considerations mandated by *Furman* and succeeding cases. Here one reaches the exceedingly difficult problems of statutory construction discussed in *McGautha.* One also confronts the still more difficult question of whether the "rational review" process mandated by *Furman* can be seen as improving on initial jury determinations or merely "second-guessing" them. *See Godfrey, supra,* at 451, 100 S.Ct., at 1776 (White, J., dissenting).

This Court has now had occasion to consider the first of these twin concerns in the specific context of *Burger.* Of course, after *Gregg* there is no doubt that the Georgia statute is facially constitutional under the mandates of *Furman.* There is, however, much room for doubt as to whether this statute in fact escapes the problems foreseen in *McGautha.* In *Gregg,* the plurality described the benefits of the Georgia statute as follows:

> No longer can a Georgia jury do as Furman's jury did ... Instead, the jury's attention is directed to the specific circumstances of the crime: Was it committed in the course of another capital felony? Was it committed for money? Was it committed upon a peace officer or judicial officer? Was it committed in a particularly heinous way or in a manner that endangered the lives of many persons? In addition, the jury's attention is focused on the characteristics of the person who committed the crime: Does he have a record of prior convictions for capital offenses? Are there any special facts about this defendant that might mitigate against imposing capital punishment (e. g., his youth, the extent of his cooperation with the police, his emotional state at the time of the crime).
>
> 428 U.S. at 197, 96 S.Ct., at 2936 (Stewart, Powell, and Stevens, JJ., citing

*Moore v. State,* 233 Ga. 861, 865, 213 S.E.2d 829 (1975)).

This limited analysis is at best disturbing. The announced purpose of *Furman* was, after all, to separate those few who deserved capital punishment from the many, including, of course, Mr. Furman, who did not. Nonetheless, the Court is all but silent on how a very broad, general listing of factors such as the Georgia statute might promote, much less produce "rational" results. Such a conclusion is hardly obvious in light of the fact that Furman himself would readily qualify for execution because his homicide was committed in the course of a capital crime, armed robbery. Similarly, there is no suggestion as to how or why isolating the jury's attention on a factor like greed (murder "committed for the purpose of receiving money or any other thing of monetary value," Ga.Code Ann. § 27–2534.1(b)(4)), would tend to separate the deserving from the undeserving. Again, Mr. Furman might be said to merit death by this criteria, even though *Furman* holds such a sentence unconstitutional based on a record which specifies few, if any, mitigating circumstances in the character of the defendant. *Furman, supra,* 408 U.S., at 294, n.48, 92 S.Ct., at 2754, n.48 (Brennan, J., concurring).

Consideration of remaining aggravating factors under the Georgia statute does nothing to alleviate these doubts. Thus, one finds that the first aggravating factor under the statute ("the offense ... was committed by a person ... who has a substantial history of serious assaultive criminal convictions") was declared unconstitutionally vague by the Georgia Supreme Court. *Arnold v. State,* 236 Ga. 534, 540, 224 S.E.2d 386 (1976). Obviously, then, no guidance can be found in it. It is only a little less difficult to see how the fact that a homicide was committed "in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person," § 27–2534.1(b)(3), can be seen as "rationally" directing a jury where the statute does not similarly list the killing of more than one person as an ag-

gravating factor. Indeed, the proposition that two murders are generally worse than one would seem utterly unassailable, but it is curiously absent from the Georgia statute.[2]

The remaining factors seem no more helpful. Only (b)(7), which has already been discussed at length, and (b)(6), which describes murder by means of or in the role of an agent, do not relate specifically to homicides committed against judicial or police officials, or by an escaping criminal. Of course, (b)(7) was held in *Godfrey* to provide effectively no guidance for a jury. Section (b)(6) may be seen as more specific but it would surely prove inapplicable to many crimes as would factors relating to homicides by escapees or against public officials. At best, these guides would seem to provide only limited assistance in some quite possibly small number of factual contexts.

In light of all these problems, it is perhaps not surprising that the endorsement of the Supreme Court was less than ringing:

> While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that can be fairly called capricious or arbitrary.

428 U.S., at 194–95, 96 S.Ct., at 2935 (Stewart, Powell, and Stevens, JJ.).[3] Thus, the Court appears to find the Georgia statute better than nothing at all. Nonetheless, this Court must seriously wonder whether the Georgia statute in fact amounts to more than a mere random enumeration of fac-

tors, which would be entirely inapplicable in many arguably extreme cases and entirely obvious in others.[4] Certainly, there would seem to be nothing particularly novel or interesting in a statutory requirement that the crime and the criminal be considered by a sentencing jury. Such an admonition forbids only mandatory sentencing. It does not in any apparent way prevent or control the problem of arbitrary imposition of the death penalty. Indeed, it would appear that these broad, overlapping factors would not merely authorize but invite imposition of the death penalty in many cases where an undirected jury would be most reluctant to impose death. Of course, this view is consonant with the historical fact that statutory formulations have generally included many more cases than juries have been willing to recognize.

## IV

Whatever the possible benefits of these statutory instructions standing alone, they must ultimately be considered in the light of the third level of protection afforded the accused under *Furman*: appellate review of the decision to impose the death penalty. Much as with the statutory aggravating circumstances, *Gregg* finds cause for comfort in the Georgia provision for automatic review by the State Supreme Court:

> That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance,

2. Some states do in fact make multiple murder an aggravating factor as such. Interestingly, had Georgia followed this policy, the problem of (b)(7) might not have arisen in *Godfrey*, 446 U.S., at 432, n.15, 100 S.Ct., at 1767, n.15. This Court particularly questions the "rationality" of a statute which so easily supports *Furman's* sentence for an "accidental" killing, yet cannot constitutionally reach the "hideous" double murder about which Godfrey declared, "I have been thinking about it for eight years . . . I'd do it again." 446 U.S., at 426, 100 S.Ct., at 1763.

3. This quotation relates specifically to a set of factors developed by ALI for the Model Penal Code (Tent.Draft No. 9, 1959). However, it

would seem applicable to the Georgia statute, which is similar in many respects. See 428 U.S., at 193, n.44, 96 S.Ct., at 2934, n.44.

4. There is no doubt that the court recognized that this problem might exist:

> A system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur.

428 U.S., at 195, n.46, 96 S.Ct., at 2935, n.46. Nonetheless, the Court does not much consider whether the Georgia statute fails on this account.

and whether the sentence is disproportionate compared to those sentences imposed in similar cases ... [T]o guard against a situation comparable to that presented in *Furman,* the Supreme Court of Georgia compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate.

428 U.S., at 198, 96 S.Ct., at 2937 (Stewart, Powell, Stevens, JJ.). The Supreme Court thus concludes that the Georgia procedures are constitutional "on their face."

. This Court has already touched on the enormous problems inherent in review of "similar cases" in *Moore.* As I indicated there, it is no simple task to identify what cases are in fact "similar" for purposes of sentencing review. Because the trial judge was extraordinarily careful to note explicitly the basis of his determination, it was possible in *Moore* to classify that case as a "residential murder" and to compare it with other cases accordingly. Obviously, had this guidance been unavailable, as it would be with any jury, no court could have said with assurance that the site of the crime was controlling. It would have been possible only to consider Mr. Moore's case in some much more general context, with a result that might or might not have been the same.

This problem is obviously very broad. The state tribunal is commanded to consider the accused as "uniquely individual human beings." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (Brennan, J., concurring). This truism notwithstanding, it must also find "similar cases" and thus reach "similar results." Murder is by its very nature and definition a gross and extraordinary aberation from the norms of civilized conduct. It would therefore seem to be among the least likely of all phenomena to admit to easy or useful classification. How often, for example, can a jurisdiction be expected to confront a homicide such as this one:

[T]he victim had been disemboweled and a butcher knife with a 12-inch blade was plunged into the unclothed upper part of her body. Her internal organs had been removed. She suffered 44 separate stab wounds in the trunk and chest....

*Fulghum v. State,* 246 Ga. 184, 269 S.E.2d 455 (1980). How frequently may a state find a crime such as this:

At the time of her death, the nine months old child weighed 5½ pounds, had 2 rib fractures, parts of her lungs had begun to collapse, and she was so severely malnourished and dehydrated that her liver had been damaged, her skin had dried and wrinkled from a loss of underlying fatty tissue and her abdomen had swollen and was distended. Further she had wounds of unknown origin in various stages of healing on her head, face, neck, back, chest, genital area, legs and arms.

*Lackey v. State,* 246 Ga. 331, 271 S.E.2d 478 (1980). These two cases, drawn from the most recent volume of the Georgia Reporter, may suggest the truly extraordinary ranges of depravity which must be filled before any comparison of "similar cases" is possible. Moreover, the fact that neither *Lackey* nor *Fulghum* resulted in the death penalty should only reinforce this conclusion.

It is obvious then that the requirement that "similar cases" be considered creates enormous practical difficulties when the extraordinary range of human depravity encompassed under the term "homicide" is considered. But, nonetheless, this fact is probably the least significant problem in a proportionality review. Much more difficulty is apparent in the initial process of characterizing the case to be compared. As was suggested in *Moore* earlier, there is simply no "rational" basis for choosing between such views. This problem has already been detailed with respect to *Godfrey,* but other examples are readily available. Thus, one sees no "objective" way to decide whether a proportionality review in *Fulghum* should focus on the extraordinary facts quoted above, or other, perhaps equally extraordinary points which could have been cited:

[A]ppellant had a religious obsession concerning the devil and had at various times attempted to pull his eyes out and kill himself ... Family members testified concerning appellant's religious obsessions and various hospital commitments. Dr. Lloyd T. Baccus, a psychiatrist, who examined appellant under a court order, concluded that appellant was a paranoid schizophrenic, chronic type. It was his opinion that appellant had attempted to convert Ms. Pirrie and then had seen her as a personification of Satan. This had lead to appellant's act of murder. . . .

246 Ga., at 185, 269 S.E.2d 455. On such a record, this Court can see no way to characterize the crime which could not fairly be termed an "arbitrary and capricious" choice. Certainly, this Court would find little guidance in commentaries like the remark of *Godfrey* that "[a]n interpretation of § (b)(7) so as to include all murders resulting in gruesome scenes would be totally irrational." 446 U.S., at 433, n.16, 100 S.Ct., at 1767, n.16 (Stewart, Blackmun, Powell, Stevens, JJ.).

The problems inherent in proportionality review are not merely matters of definition. Even were it possible to know which, among the many facts of a particular case, were determinative, and, even were it also possible to identify a sample of "similar cases," it would still be necessary to find some pattern to follow. However, the central thesis of *Furman* is that juries had, to that time, failed to follow any pattern at all. *Furman*, of course, characterizes prior jury sentencing as "freakish" and based on mere "whim," which admitted no rational distinction. *See, e. g.*, 408 U.S., at 294, 92 S.Ct., at 2754. Thus, no constitutional pattern can possibly be expected in this pre-1972 law. Moreover, if such a pattern were ever to be devised, it would surely require some profound change in jury behavior under the new statute. Additionally, these changes would need years to become apparent and to be applied to a sample of situations broad enough to support meaningful appellate review. There is simply no basis whatever for believing that sentencing pro-

cedures have changed significantly in Georgia since the current statute was enacted. *See* Bowers and Pierce, Arbitrariness and Discrimination Under Post-*Furman* Capital Statutes, *Crime & Delinquency*, 563 (October, 1980); *see also* Dix, Appellate Review of the Decision To Impose Death, 68 Geo. L.J. 97 (1979). Moreover, there was certainly no significant moritorium on imposition of capital punishment after *Furman* to allow such patterns to appear. Thus, it can hardly be surprising that *Moore v. State*, decided in 1974, relied *inter alia* on several pre-*Furman* cases. *See, e. g.*, *Callahan v. State*, 229 Ga. 737, 194 S.E.2d 431 (1972).

In sum, it appears to this Court that the procedures mandated by *Furman* do not now and in fact never will achieve the standard set out in that opinion and succeeding cases. It is apparent from even the brief review undertaken here that the Georgia statute in particular falls well short of the monumental intellectual breakthrough which has eluded draftsmen through most of Anglo-Saxon political history. Far from guiding juries to rational choices, the statute merely catalogues a laundry list of considerations which would be obvious to any jury considering an appropriate case, but provide little, if any, real basis for their determination. Moreover, even were these factors adequately developed, there is little reason to conclude that any rational pattern might be divined given the enormous variety of factual patterns in homicide cases and the impossibility of determining which supported the jury's verdict. Finally, of course, there is simply no reason for believing that any such patterns exist or could exist, at least so long as the Supreme Court continues to sanction "arbitrary and capricious" decisions *not* to impose the death penalty. *See, e. g.*, *Gregg, supra*.

## V

This discussion is certainly general and preliminary. But, I believe it sufficient to support several broad comments. In the first place, one can appreciate the profound difficulty facing state legislatures and judiciaries in developing and applying capital

sentencing statutes. As *McGautha* demonstrates, centuries of effort in innumerable different social and political contexts have failed to devise any system which separates homicides worthy of capital punishment from those meriting a lesser penalty. In fact, if juries are to be regarded as the "conscience of the community" in these determinations, it appears that no statute can be drawn narrowly enough to divine the very unusual circumstances where death is to be considered appropriate. The modern requirement that statutes further narrow even this limited range of cases seems if anything less feasible than prior efforts.

Against this broad historical backdrop, the Georgia law cannot be seen as a legislative failure, so much as still another reflection of the impossibility of the task. Similarly, the failings of the Georgia Supreme Court as outlined here in *Moore*, as well as in *Godfrey*, would appear to be inevitable. The state judiciary can hardly be faulted for not following patterns which do not now exist and never have. Nor can the state courts be faulted for failing to properly characterize particular cases or types of cases, when such questions of definition are, in overwhelming part, subjective matters which admit no *legal* solution.

If present law mandates the impossible from state judicial systems, it places the federal tribunal in no better position. Once general due process requirements, such as those found determinative in *Blake*, are met, and the more specific procedural requirements of capital sentencing are satisfied, as they were not in *Burger*, the federal court is forced to the brink of the extraordinary proportionality analysis which was necessary in *Moore*.[5] Inevitably, such an analysis forces the federal court "continuously to question every substantive decision of the [state] criminal justice system with regard to the imposition of the death penalty." *Spinkellink, supra,* at 604.

If, as this Court suspects, it is becoming obvious that the states *cannot* meet the requirements of *Furman* no matter how careful their efforts,[6] federal tribunals will be forced into wholesale second-guessing of verdicts which were arrived at in good faith, upon competent evidence, and at no little cost in public and private resources, to say nothing of the strain placed upon conscientious jurors in their "awesome determination." Moreover, such developments would also bring enormous "friction" to the federal system as well as between the courts and the general public, "friction" which is itself grossly disproportionate to the wretched, demented lives that often hang in the balance. Obviously, if the Constitution does mandate the impossible, the public should be informed so that their laws—or the Constitution—can be adjusted accordingly. If, upon further reflection, it appears that the Constitution does not mandate all the requirements of *Furman*, this, too, must be made clear. The resources of the federal judiciary are far too limited and the stature of the judicial branch far too hard-earned and too fragile to be dissipated in futile demands that the states somehow achieve the impossible.

## VI

Among the more extraordinary results of *Furman* and its progeny is to bring unity to the views of two of the Supreme Court's most ideologically distant members. Thus, in *Woodson v. North Carolina, supra,* Justice Rehnquist concludes in dissent that

it is not at all apparent that appellate review of death sentences, through a process of comparing the facts of one case in which a death sentence was imposed with the facts of another in which

---

5. Of course, *Spinkellink* suggests that proportionality analysis can be avoided where there is no reason to believe that the state courts are not properly following a constitutionally drawn statute. However, as has been pointed out here, there is good reason to doubt that Florida, or Georgia, or any state can follow the dictates of *Furman*. *See* Dix, *supra*.

6. Considering the very significant similarity between the crimes in *Furman* and *Moore*, it would seem that, if Georgia *is* following its statute properly, the exercise may be largely meaningless in any event.

such a sentence was imposed, will afford any meaningful protection against whatever arbitrariness results from jury discretion. All that such review of death sentences can provide is a comparison of fact situations which must in their nature be highly particularized if not unique, and the only relief which it can afford is to single out the occasional death sentence which in the view of the reviewing court does not conform to the standards established by the legislation. 428 U.S., at 316, 96 S.Ct., at 2997. As for the efficacy of those standards, Justice Rehnquist echoes the logic of *McGautha* that development of meaningful standards lies "beyond present human ability." 428 U.S., at 320, 96 S.Ct., at 2998, *quoting McGautha, supra,* 402 U.S., at 204, 91 S.Ct., at 1465.

Five years later, concurring in *Godfrey,* Justice Marshall, while adhering to his view that the Constitution forbids "arbitrary" infliction of the death penalty, nonetheless concluded that "the Court in *McGautha* was substantially correct in concluding that the task of selecting in some objective way those persons who should be condemned to die is one that remains beyond the capacities of the criminal justice system." 446 U.S., at 442, 100 S.Ct., at 1772. Furthermore, Justice Marshall concludes, based on a variety of factors, that appellate courts are probably "incapable of guaranteeing the objectivity and evenhandedness that the Court contemplated and hoped for in *Gregg.*" *Id.,* at 439, 100 S.Ct., at 1770.

Of course, this agreement on the current state of the law certainly does not extend to a common prescription of the solution. But, it does perhaps signal the possibility of some change. Other facts also point to the likelihood, if not the necessity, for a serious reassessment of the *Furman* approach. Two are obvious here. In *Gregg,* the Supreme Court cites *Moore v. State, supra,* for the proposition that mitigating factors ("his youth, the extent of his cooperation with the police, his emotional state at the time of the crime," 428 U.S., at 197, 96 S.Ct., at 2936 (quoted above)), are to be considered.

In fact, *Moore* displayed *all* these mitigating factors and others as well. Yet, the death penalty was sustained.

Second, in *Godfrey,* the Supreme Court avoided the conclusion that (b)(7) had never been effectively limited in Georgia by abstracting several propositions from the Georgia case law. This discussion included *inter alia* the observation "derived from *Blake* alone ... that the word 'torture,' must be construed *in pari materia* with 'aggravated battery' so as to require evidence of serious physical abuse of the victim before death." 446 U.S., at 431, 100 S.Ct., at 1766 (Stewart, J.) (footnote omitted). In fact, the trial court's report in *Blake* specifically indicates that the victim was *not* physically harmed or tortured in any way. Thus, even if the Georgia Supreme Court can be credited with the proposition derived from *Blake,* this proposition has not been followed even with respect to Mr. Blake himself. *See also* 446 U.S., at 436, 100 S.Ct., at 1768 (Marshall, J., concurring).

I will not attempt to specify here by notion of the ultimate or proper outcome of a reevaluation of *Furman.* However, several points are clear from *Blake, Burger,* and *Moore.* First, it does not seem possible to completely eliminate proportionality review. *Moore* demonstrates that some judicial role is essential, if only so that the judiciary may correct its own mistakes. Extreme cases like *Moore* do indeed "shock the conscience." Moreover, because specific factual findings can be available, this review need not be perfunctory or unguided. Similarly, this Court believes that an occasional jury determination may be the proper subject for appellate reversal where no rational basis for the sentence of death can be divined. Thus, the major contribution of *Furman* may in retrospect be the conclusion that evolving standards of society now limit capital punishment to "a small number of extreme cases." *Gregg, supra,* 428 U.S., at 182, 96 S.Ct., at 2929 (Stewart, Powell, and Stevens, JJ.). A defendant may be due the benefit of this development, and reviewing courts may perhaps properly decline to sanction a death sentence where no rational trier of fact could place the crime or the

criminal at this extreme. *Jackson v. Virginia,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). *See also Godfrey, supra,* 446 U.S., at 451, 100 S.Ct., at 1776 (White, J., dissenting).

To be sure, this standard is vague. But, nonetheless, it is a judicial standard and a judicial approach. At the least, it spares other reviewing courts the extraordinary role of connoisseur of blood and dementia which necessarily accompanies the comparative analysis approved in *Gregg* and conducted here in *Moore.* Of course, visions of comparing "similar cases" and discovering "patterns" of sentencing have the seductive appeal of science and mathematics. But, as Justice Harlan observed, this appeal is illusory. There is no objective way to describe "the case" at hand. There are no "similar cases," and there is no constitutional sentencing "pattern." On the other hand, applied with due care and circumspection, a *limited* judicial standard offers the opportunity for meeting the occasional, exceptional situation where imposition of the death penalty might amount to an error of constitutional dimensions. This limited role is not merely all that an appellate or habeas court should play; it is the only role these courts *can* play. "Such is the human condition." *Spinkellink, supra,* at 605.